CHADWICK v. BENEFICIAL LIFE INS. CO.

No. 3406.    Decided April 30, 1920.    On application for rehearing, July 22, 1920.    (191 Pac. 240.)

1. APPEAL AND ERROR—OPINION ON FORMER APPEAL LAW OF CASE ON SUBSEQUENT APPEAL. Opinion on former appeal is controlling on subsequent appeal as to all questions raised and passed on on former appeal.

2. INSURANCE—INSURED HELD TO HAVE MADE STATEMENTS IN APPLICATION. In action on life policy, in which insurer sought to avoid policy on ground of false statements in application as to condition of his health, insured not having denied reading application before signing, he will be deemed to have made statements therein, where application expressly stated that no in-

formation with which insurer should be made acquainted had been withheld, that statements therein by insured constituted the basis of the policy, were true, and were offered to insurer as a consideration for the contract.

3. INSURANCE—REPRESENTATIONS AS TO INSURED'S HEALTH HELD MATERIAL. Representations in application for life policy as to condition of husband's health and as to consultation of physicians *held* material.

4. INSURANCE—MATERIAL REPRESENTATIONS AS TO HEALTH KNOWN FALSE AVOID POLICY. If insured, at the time of making his application for a policy, has knowledge, or good reason to know, that he is afflicted with a disease that renders his condition serious, and that thereby his longevity will be prejudicially impaired, his statements and representations to the contrary, in reply to specific inquiries, constitute a fraud upon the insurer which invalidates the policy.

5. INSURANCE—REFUSAL TO DIRECT VERDICT FOR INSURER HELD ERROR. In action on life policy, defended on ground that insured in application represented himself to be in good health, where it was conclusively established beyond the possibility of a doubt that insured was suffering from the disease from which he died at the time that he applied for the policy, and where there was uncontradicted testimony that insured himself stated shortly before making application that he was under constant care of a doctor, and that he was in serious condition, court's refusal to direct verdict for insurer on ground that false statements avoided the policy, in view of Comp. Laws 1917, section 1154, subd. 3, *held* reversible error.

WEBER, J., dissenting.

Appeal from District Court, Second District, Weber County; *J. D. Call*, Judge.

Action by Maud Chadwick against Beneficial Life Insurance Company. Judgment for plaintiff, and defendant appeals.

REVERSED and REMANDED.

*Young & Young*, of Salt Lake City, for appellant.

*A. G. Horn,* of Ogden, for respondent.

CORFMAN, C. J.

Plaintiff brought this action in the district court of Weber county to recover a judgment against the defendant on a life insurance policy issued by the defendant upon the life of her husband, J. Charles Chadwick, wherein she was named as the beneficiary. The policy was issued June 1, 1916, and attached thereto and expressly made a part thereof was a copy of the signed application of the insured, J. Charles Chadwick, dated May 29, 1916, containing the purported questions propounded by the defendant's medical examiner to, and the answers made by, the applicant. In compliance with Comp. Laws Utah 1917, section 1154, subd. 3, the policy contained the provision that "all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall avoid or be used in defense under the policy unless it is contained in the written and printed application and a copy of such application is indorsed on the policy issued."

In so far as may become material for a proper consideration of the issues involved in this case the signed application indorsed or attached to and made a part of the policy contains these express agreements on the part of the insured:

"I hereby declare and agree that I am now * * * in good health, and ordinarily have good health, and that in my statements and answers in this application, and to the medical examiners, no information has been or will be withheld touching my past and present state of health * * * with which the Beneficial Life Insurance Company should be made acquainted; and that the statements and answers to the printed questions above, together with this declaration, as well as those made by the company's medical examiner, shall constitute the application and be the basis of this contract."

Also:

"I hereby agree that the foregoing statements made to the company's medical examiner are a part of my application for insurance, are declared to be true, and offered to the company as a consideration for the contract."

The insured, J. Charles Chadwick, died August 13, 1916, and thereupon, after refusal of the defendant company to pay the death loss under the policy, the beneficiary commenced this action in the usual form.

The case has been twice tried before a jury in the district court, and this is the second appeal to this court. The first appeal was by the plaintiff from a judgment entered upon a directed verdict in defendant's favor. We reversed that judgment, and ordered that the plaintiff be granted a new trial. *Chadwick* v. *Beneficial Life Ins. Co.*, 54 Utah 443, 181 Pac. 448. A new trial being granted, the defendant applied for and was granted permission to amend its answer, which as amended, after admitting the issuance and delivery of the policy, the death óf the insured, and its refusal to make payment, sets up the following defenses:

"(1) That the said policy of insurance was issued by this defendant and accepted by said Chadwick in the following express condition and agreement contained in said policy and made part of said contract of insurance, to wit: That the statements and answers contained in the application for insurance and in answer to the medical examiner of the defendant company, and on the faith of which said policy was issued, were in all respects true, and that no information had been withheld touching the past or present state of health of the applicant with which the defendant company should have been acquainted; and upon the further consideration, to wit, that the answers and statements so made in said application and to the medical examiner, together with the declaration contained in the said application form, should constitute the application, and be the basis of the contract between said Chadwick and the defendant company.

"(2) That the said Chadwick violated the conditions contained in said application form, and on faith of which the said policy of insurance was issued, in that he stated therein that he was in good health at the time of making application for insurance to the defendant company; and that, further, the said Chadwick in answer to said question No. 11 of the questions submitted to him as aforesaid by the medical examiner of the defendant company, to wit, 'Are you in good health so far as you know or believe?' answered, 'Yes;' whereas, the said Chadwick at the time was, and for some time prior to applying for insurance to the defendant company had been, suffering with a disease which tended to prejudicially influence his health and impair his longevity, and from which disease

the said Chadwick in fact died on or about the 13th day of August, 1916; and that at the time that the said Chadwick made his aforesaid application for insurance and answered the said question No. 11 submitted to him by the defendant's medical examiner as aforesaid the said Chadwick knew, or had reason to believe, that he was not in good health, and was afflicted with a disease which tended to prejudicially influence his health and impair his longevity.

"(3)   That the said Chadwick further violated the conditions contained in said contract of insurance in that in the answer made to question No. 6 contained in the statement made to the medical examiner of the defendant company as aforesaid, which question reads as follows, to wit: 'Give name and address of physician last, consulted,' the said Chadwick answered, 'None;' whereas, in fact, within the space of a few weeks prior thereto, he had consulted doctors at Afton, Wyoming, and at Ogden, Utah, in regard to the disease with which he was at such time afflicted and from which he died.

"(4)   That the said Chadwick further violated the conditions contained in said contract of insurance in that in the answer made to R of question No. 5 contained in the statement made to the medical examiner of the defendant company as aforesaid, which question reads as follows, to wit, 'Have you ever had any of the following diseases?   Of each illness state date, number of attacks, duration, severity, complications, and result, thus avoiding correspondence and delay.   R. Rheumatism or gout'—the said Chadwick answered, 'No;' whereas, in fact, the said Chadwick was at such time suffering with a disease which he believed, or had reason to believe, tended to prejudicially influence his health and impair his longevity, and which, as the result of the opinion expressed to him by his physician, the said Chadwick then believed to be rheumatism."

Upon submission of the case to the jury on the second trial the defendant again moved the district court for a directed verdict in its favor, which was denied.   The jury then returned a verdict in plaintiff's favor, and judgment was entered thereon against the defendant for the amount of the policy, interest and costs.   Motion for new trial was made and denied.   Defendant appeals, and assigns as errors:   (1) The denial of defendant's motion for a directed verdict; (2) the refusal to charge the jury as requested by defendant; (3) denial of motion for new trial; (4) that the evidence was insufficient to support the verdict, and that the judgment is contrary to law.

Briefly stated, the testimony shows that the insured had

been a rancher by occupation, strong and vigorous until on about February 1, 1916, when he became afflicted with some malady causing him pains in the back. He then resided at Afton, Wyo., where he consulted a physician, one Dr. Reese, who diagnosed the case and treated and advised with him about twice a week from February 1st until about the middle of March for what was supposed to be rheumatism. The malady did not yield to the treatment of Dr. Reese, and the health of insured became so seriously impaired that he could not perform his customary labors without resulting pain and distress. About the latter part of March the insured went to Ogden, Utah, and did not return to Afton until about July 1st. While at Ogden he was attended by Dr. Rich, who treated him and placed him in a plaster cast, which he was wearing on his return to Wyoming in July. He continued to grow worse, and finally died August 13th. After death an autopsy was performed on the body by Dr. Reese, who found and testified that the insured had died of tuberculosis of the spine. On the 29th day of May the insured made application for a life insurance policy to the defendant, in which application he expressly agreed and declared:

"I am now in good health, and that in my statements and answers in this application and to the medical examiner no information has been or will be withheld touching my past and present state of health * * * with which the Beneficial Life Insurance Company should be made acquainted."

As appears from the application, among other questions asked of the insured by the medical examiner were the following:

"Q. Have you ever had any of the following diseases? * * * R. Rheumatism or gout? A. No. Q. Give name and address of physician last consulted. A. None. Q. Are you in good health, so far as you know or believe A. Yes."

The physician, Joseph R. Morrell, who conducted the medical examination, testified that the foregoing questions were propounded to the insured, and that the answers made were recorded in the application as given to him by the insured. The same witness testified that the usual physical examination was given the applicant, from which it was not apparent

that the applicant was suffering with or had any symptoms of the disease tuberculosis of the spine. The witness also testified that, had the applicant answered the questions propounded to him in the medical examination truthfully, the information he would have obtained, if there was a presence of tuberculosis of the spine, would elict something that would make him suspicious of such a condition. The same physician, Dr. Morrell, the testimony shows, made a confidential report to the defendant company that he was satisfied that everything had been fully stated as to applicant's physical condition in the application, and that he recommended the applicant for insurance without reservation. The witness Dr. Morrell further testified that he would not have made the recommendation he did make of the applicant had he given him the information that he had consulted physician Reese in February and March before, concerning pains in the back which became more intense and severe after performing hard labor; and that he would have used such information had he obtained it in the medical examination as a basis for finding out the ailment for which the applicant had been under treatment. Three other physicians, together with Dr. Morrell, in answer to hypothetical questions propounded to them by the defendant, in which the ailment causing the death of the insured and its symptoms were described, testified that the applicant would know, or have reason to believe, he was suffering with some disease, even if he did not know what it was, of a serious nature.

Junius Romney, a witness in behalf of the defendant, testified that he was superintendent of agencies for the defendant company, and that after the death of the insured he visited the plaintiff beneficiary at Afton to investigate plaintiff's claims under the policy and that plaintiff then stated that—

"Her husband had been a strong, vigorous man, doing outdoor work, up until that same year in the month of March, when she said he began to complain of pains in his back and of being unable to do his work as usual, as had been his custom; that they had gone to consult the Drs. Reese, the local physicians there, who had first diagnosed his case as rheumatism, and treated him for that,

but that the malady did not yield to the treatments they gave, and as a result they stated they thought it was tuberculosis of the spine, and advised him to go to the state of Utah and consult specialists in regard to his case. She said he came to Ogden for that purpose, and consulted Dr. Rich and others; that she later joined him in Ogden, and after treatment here he returned to Afton, his home, with a plaster of Paris cast, and that he later died."

Carl Cook, a witness on behalf of the defendant, testified that in the spring of 1916 he was acting as clerk of the district court at Kemmerer, Wyo., and as such clerk he issued a summons for the insured to be in attendance upon said court as a juror May 1, 1916; that the insured did not attend, but about a week or ten days before the opening of the court he received a letter from the insured stating in substance and to the effect that he was in Ogden under the constant care of a doctor; that he was in a serious condition, and unable to leave Ogden to attend court, and asked the witness to take steps to have him excused for the term.

Maude Chadwick, the plaintiff testified that the insured had been a strong and vigorous man, doing his customary farm labor and logging in the canyon, until the early months of 1916, when he commenced complaining of pains in his back; that he consulted the family physician, Dr. Reese, before going to Ogden in March; that she and the insured did not consult together as to his making the trip to Ogden to see a physician, and that "practically the only reason" for the trip to Ogden was for the purpose of a visit to friends and family relatives; that she had no personal knowledge that he consulted a physician at Ogden, but that he did consult a chiropractor, one Dr. F. J. Freenor; that she and the insured had talked over the advisability of his having chiropractic treatments for some ailment causing pain in the back which they had thought to be rheumatism; that when insured returned from Ogden in July he was wearing a plaster cast and was a very sick man. The witness further testified:

"Q. Do you remember making the statement that Dr. Reese had advised you prior to the time of your husband's coming down to Ogden that your husband was suffering from tuberculosis of the spine? A. I did not."

Some eight witnesses, neighbors of deceased, testified to the effect that they had been acquainted with the insured prior to June 1, 1916, and that they did not know of his being sick or confined to his bed prior to that time.

Counsel for defendant admits on this appeal that in so far as this jurisdiction is concerned the law applicable to this class of cases has been fully and decisively declared by the former opinion of this court. However, counsel calls our attention to the defendant's amended answer, and the additional testimony offered and received at the second trial of the case, and then proceeds to very vigorously and earnestly contend that the defendant on the present appeal has met every requirement, both as matter of law and fact, that may be found necessary for a reversal of the judgment of the district court and to have the issues finally determined in its favor.

The plaintiff meets us at the very threshold, and contends that there are no new issues presented under the pleadings as amended by defendant, and insists that the testimony is practically the same as on the former appeal; that no new testimony was offered and received in the retrial of the case before the district court, except such as would give rise to a disputed question of fact; and therefore there is nothing left for us to do but affirm the orders and judgment the defendant has appealed from. By reason of the extremely divergent views of counsel as to the result that should be readily arrived at by this court, and in order to make clear the issues involved in the second trial, we have heretofore made a more comprehensive statement of the case, both as to the pleadings and testimony, than we otherwise would have done upon the present appeal.

However, it will be kept in mind that as to the law applicable to the case our former opinion is controlling on all questions then raised and passed upon.

The defendant very strenuously contends that the insurance policy in question was procured by fraud practiced upon it by the insured. The fraud relied upon by the defendant as invalidating the policy was, first, the declara-

tion and express agreement made by the insured in his application that "I am  *  *  *  now in good health, and ordinarily have good health, and that in my statements and answers in this application and to the medical examiners no information has been or will be withheld touching my past and present health  *  *  *  with which the Beneficial Life Insurance Company should be made acquainted," etc.; second, that the insured made false and fraudulent representations as to material matters contained in his application, and untrue answers to defendant's medical examiner concerning the state of his health, when he knew, or should have known, them to be untrue.

Bearing on these questions much has been said, and authorities cited, in the former opinion of this case written by Mr. Justice THURMAN, 54 Utah, 443, 181 Pac. 448. In so far as the findings and rulings made by this court on the former appeal may have any bearing on the additional facts disclosed by the record and the questions now involved it was then held:

(1)  "If there was any testimony which the jury as a matter of law should have considered in order to determine the question of liability, the court had no right to direct a verdict."

(2)  "The burden was on the defendant to void the policy by proving that it was procured by fraud. It was not sufficient merely to prove that the deceased made false answers to questions propounded by the medical examiner. It was incumbent upon defendant to prove that the answers were not only untrue, but that the deceased knew, or should have known, them to be untrue."

(3)  "The question of good faith on the part of the insured by the defendant's answer is made the very gist of the controversy. As a matter of pleading it is made the essential element of the defense.  *  *  *  In view of our statute (section 1154, C. L. 1917), *  *  *  ,in a case of this kind, where an insurance company relies upon false statements and answers of the insured as a defense against an action on the policy, it must not only allege, as the defendant has done in this case, that the statements and answers are untrue, but also that the insured knew, or should have known, them to be untrue at the time he made them. Not only this, but as a necessary corollary in judicial proceeding the truth of such allegations should be substantially established at the trial."

(4)  "Under the issues made and the authorities referred to, assuming the deceased made the statements and answers relied on

by respondent, the controlling question is, did the deceased in good faith believe he was afflicted with only a temporary ailment, or did he, on the other hand, know, or have reason to believe, that he was afflicted with a disease which tended to prejudicially influence his health and impair his longevity? If the former, the statement, even if untrue, would not, as a matter of law, void the policy; if the latter, it would." "The same rule must be applied in considering the negative answer of deceased as to the name and address of the physician last consulted." "As the plaintiff is the beneficiary of the policy and entitled to the exclusive enjoyment of the benefits that may be derived therefrom, any admissions made by her as to the health of her husband and his consultation with physicians, under the issues presented, were clearly admissible."

The foregoing expressions made by this court in its former opinion become the law of the case. However, a retrial was had, new features were introduced by way of amendments to the defendant's answer, and additional testimony has been received not only in support of the amended pleadings, but also for the purpose of strengthening the contentions made by the defendant on the former trial. It therefore becomes our duty to again pass upon the case and review the record with conscientious consideration.

It is undisputed that the policy was applied for and that it was issued. It was brought out, however, in the testimony, that the insured, after receiving the policy, made the statement to his wife, the plaintiff, that he had not been asked the following questions contained in the application, "Give name and address of physician last consulted;" to which the answer is recorded, "None." "Are you now in good health so far as you know?" to which the answer is recorded, "Yes." The plaintiff contends that this testimony gave rise to questions of fact for the jury to pass upon, notwithstanding the record shows that the medical examiner, who did not testify at the first trial, gave positive testimony upon the second hearing of the case that the foregoing questions were actually propounded to, and answers made by, the insured precisely as he recorded them and as they now appear in the application. With respect to this testimony the contention of counsel for the plaintiff is right. It was for the jury alone, and not for the court, to determine the fact under

this conflicting testimony. However, there are other phases of the testimony bearing on the question of alleged false and fraudulent representations of the insured in the procurement of the policy that present much greater difficulties. It appears from the application offered and received, in evidence that it was expressly declared and agreed on the part of the insured that he was at the time of making his application "in good health and ordinarily have good health, and that in my statements and answers in this application and to the medical examiners no information has been or will be withheld touching my past or present state of health with which the Beneficial Life Insurance Company should be made acquainted; and that the statements and answers to the printed questions above, *together with this declaration,* as well as those made to the company's medical examiner, shall constitute the application and the basis of this contract [policy]." (Italics ours.) It was further provided in the signed application of the insured that his statements to the medical examiner were true and offered to the company as a "consideration for the contract." In view of these express statements which are printed in the application, and the unquestioned fact that the insured signed the application, and no question being raised that he did not read the application before signing, it must be considered as fully established that the insured made the foregoing statements last above mentioned attributed to him.

The question arises, were they material, and, if so, were they false and fraudulent, or, in other words, did the insured know or have reason to believe they were untrue? It certainly cannot be successfully contended that they were not material, for they were made the very basis of the contract. They were offered to the defendant as a consideration for the policy. That these statements were absolutely untrue the testimony in the record before us conclusively establishes beyond the possibility of a doubt. These statements were made at the very time, May 29th, when the insured was suffering with that which is generally regarded as an incurable disease, tuberculosis of the spine. It had attacked him months be-

fore, and thenceforth continued its ravages upon him unabated until death ensued.

Touching on the question of good faith of the insured, or his not having knowledge or good reason to believe that he was suffering with an ailment that was seriously affecting, or would seriously affect, his health and impair his longevity, much of the testimony was in conflict. The plaintiff testified that she and the insured thought, up to the time insured went to Ogden, that he was suffering with rheumatism, and that the pains in his back were occasioned by a rheumatic condition. Eight of the insured's close neighbors testified in effect that they in daily association with him, did not know that he was afflicted or was other than a strong and vigorous man up to the time of his leaving home and going to Ogden in March. We remark, however, that this negative testimony is of no value, and that it can have no probative force in determining whether the insured knew, or had good reason to believe, his health to be impaired after he arrived at Ogden in March; for it is very certain these Wyoming neighbors had no opportunity of observing insured while at Ogden at the time when and where the policy was applied for. The same would be true and may be said as to the testimony of the plaintiff; for according to her testimony, she was not with the insured at Ogden except for a very limited time before his return to Wyoming. In conflict with the statements made by the plaintiff as to what was considered the nature of the insured's ailment prior to his trip to Ogden is the testimony of the witness Booth that the plaintiff had made the statement to him after death of insured that they (the insured and herself) had consulted with Drs. Reese, and they thought the malady to be tuberculosis of the spine, and had advised the insured to go to Ogden and consult with specialists; that insured came to Ogden for that purpose, and consulted Dr. Rich and others, and later she joined her husband there, and after treatment returned with him to Wyoming, when he was encased in a plaster of Paris cast. This testimony was not before us for consideration on the former appeal. Again, it appears from the uncontradicted

testimony on this appeal that some time during the latter part of April, before the application for the policy was made, the insured expressly stated in writing to Clerk Cook of the Wyoming court at Kemmerer, after he had been summoned as a juror, that his health was in a serious condition and that he was under the constant care of a doctor. Again, bearing on the question of the good faith of the insured in making application for the policy, several physicians, some of them specialists in tuberculosis and kindred ailments, gave testimony in the second trial and for the first time in the case, after hypothetical questions had been propounded to them in which the symptoms, duration, and the effect of the insured's ailment upon him were detailed, that a person so affected would know and have reason to believe that he was afflicted with some disease which would seriously affect his health and prejudicially impair his longevity, although he might not know just what the disease was. Under the issues, as reframed by the pleadings upon the second trial, the defendant alleged and proved that the insured, in answer to the question found in the application, "Have you any of the following diseases? Of each illness state date, number of attacks, duration, severity, complications, and result, thus avoiding correspondence and delay. R. Rheumatism or gout," stated "No." It is not denied in the record that the foregoing question was propounded to the insured, nor is it denied that he made the answer "No" recorded in the application. It is contended by the defendant that this too sheds light on the question of good faith of the insured when he applied for the policy. In view of the uncontradicted testimony of the examining physician, who testified that had the answer been given in the affirmative (which, according to the contention of plaintiff, the insured believed) he would, as an examiner, have made further investigation by reason of the suspicion that an affirmative answer would have aroused in his mind, we think there is much force in defendant's contention; that had the answer been made in the affirmative the medical examiner would have made further inquiry, which, in all probability, would

have led to a discovery that the insured was then suffering with tuberculosis of the spine.

As heretofore remarked, upon the former appeal the principles of law applicable to the facts then presented were fully discussed, and the law governing in this class of cases laid down for the future guidance of the trial courts within this jurisdiction. That we then endeavored to promulgate and follow such rules of law as would tend to a most liberal construction of the insurance policy, so that unless false and fraudulent practices were resorted to on the part of the applicant and clearly proven by the insurer the validity of the policy might not be successfully questioned, a mere cursory reading of the opinion will convince. However, in the light of the additional testimony that appears upon the record of this, the second, appeal, we are of the opinion that the verdict of the jury in the plaintiff's favor, when tested by all the rules of law applicable thereto, and as formerly announced by this court, should not be permitted to stand. 54 Utah 443, 181 Pac. 448, supra. Aside from what appears to us to be the overwhelming weight of the other testimony that the insured had good reason to believe that his health was seriously affected by some disease that would prejudicially impair his longevity at the very time he made application for the policy in question, the case now comes to us with the uncontradicted testimony in the record that he himself stated, shortly before he made the application, that he was under the constant care of a doctor and that he was in a serious condition. Legally speaking, testimony of such great import in this class of cases cannot and should not be permitted to be successfully ignored by either court or jury. That the insured made the statement attributed to him stands in the record uncontradicted. That in itself ought to have ended this controversy.

If the insured at the time of making his application for a policy has knowledge or good reason to know that he is afflicted with a disease that renders his condition serious, and that thereby his longevity will be prejudicially impaired, his statements and representations to

the contrary in reply to specific inquiries constitute a fraud practiced upon the insurer, and which, when successfully proven, invalidates the policy.

For the reasons stated, we think the district court erred in not granting defendant's request for a directed verdict in its favor. . The question next arising is whether the case should be remanded to the district court with directions to dismiss the action or to order a new trial. In view of the fact that there have already been two trials followed by appeals to this court, and it does not now appear but that the plaintiff has had ample opportunity to present all of the testimony that may be produced in her favor, the writer of this opinion has a very strong conviction that the ends of justice would be better subserved in a dismissal of the action. Had the district court, upon defendant's request, directed a verdict in its favor, that would have been, under the ruling of this court in *Smalley* v. *Railroad,* 34 Utah, 423, 98 Pac. 311, a submission of the case for determination on the merits. The defendant was entitled to a directed verdict, and had it been given by the district court that would have ended the case. Nothing being apparent at this time from the record before us which would suggest the propriety of a new trial or further proceedings by way of amendment to the pleadings, or that the introduction of new or additional evidence might establish the validity of the policy sued upon by the plaintiff, this court might well exercise a lawful discretion by terminating the litigation between the parties.

However, my esteemed Associates, those concurring as well as those dissenting in the reversal of the judgment, are of one mind, that in remanding the case the order should be to grant a new trial. It is only in deference to their opinions that I yield my assent that such shall be the order.

It is therefore ordered that the judgment of the district court entered on verdict be reversed, and that the case be remanded, with direction to grant a new trial. Defendant to recover costs.

FRICK, J. I concur. It now appears from the unmis-

takable and uncontradicted declarations of the insured that he not only had reason to believe, but that he knew, that at the time he made application for insurance with the defendant he was afflicted with some serious ailment. The record now conclusively shows that he concealed from the medical examiner of the defendant some material and important information, which, had it been disclosed, would have led to the discovery of the fact that the insured was then suffering from the disease which, within a comparatively short time, resulted in his death. The fact, therefore, that the insured knew that his health was seriously impaired, and that he willfully concealed and withheld that fact from the medical examiner, necessarily, and as a matter of law, vitiates the policy. The jury had no right to disregard the statements of the insured, which were in writing and stand wholly unexplained; nor can we disregard them, although the jury, by inadvertence or for some other reason, did so. Where the evidence is conflicting, or where the facts and circumstances respecting any material fact are such that conflicting inferences may legitimately be deduced therefrom, the finding of the jury is binding upon us. Where, however, as here, the statements of the insured are uncontradicted, and in and of themselves are sufficient to vitiate the policy, it is our plain duty to set aside the finding of the jury.

In this case the decision of this court may affect every policy holder who carries insurance with the defendant company. If unjust claims are allowed against the company, it necessarily increases the rate each policy holder must pay in order to meet such claims. It may, however, go farther than that. It may affect the financial soundness and integrity of the company. Such a result would be detrimental to every policy holder. It is the duty of the insurer to avoid, as far as possible, the payment of all unjust claims. When, therefore, as here, it is made to appear without question that the insured, in making his application, knowingly concealed from the insurer his true condition of health, which was of such a serious nature that if it had been disclosed his application would necessarily have been rejected, the courts

may not shut their eyes and blindly accept the finding of the jury. Jurors usually see only those who are dependent upon the insured, and their sympathies are easily aroused in their favor. They do not stop to consider the consequences that may follow from the allowance of unjust claims. To permit a recovery upon a· policy wrongfully obtained encourages similar applications which may ultimately result in preventing the insurer from paying the claims of legitimate policy holders, and thus there may be hundreds of worthy claimants whose insurance fails because the rights of the insurer have been disregarded by the courts. The undisputed facts which must control this case are such which, to my mind, in the interest of fairness and justice, and to protect the honest policy holder, clearly require us to deny a recovery in this case as matter of law.

It is, however, further earnestly contended that the evidence on the last trial is substantially the same as it was on the former one, upon which it was held by this court that the question of whether the deceased knowingly concealed his real condition from the defendant was for the jury, and hence the district court had erred in directing a verdict. I was of the opinion that the evidence on the former hearing was such as entitled the plaintiff to go to the jury. The evidence respecting the deceased's knowledge of his actual state of health was in doubt, and that was true also with regard to whether he made the answers respecting his consulting a physician or whether those were written by some other person. There was some doubt, therefore, as to whether deceased knowingly misstated or concealed facts concerning his state of health and the consulting of a physician. Those questions however, as the evidence now stands, are no longer in doubt for the following reasons: The evidence is without dispute that the answers were made on May 29th, and that the deceased died August 13th, just seventy-five days thereafter; that he died from tuberculosis of the spine; that the disease is in its nature progressive, and in most instances terminates fatally, sometimes sooner, somtimes later; that the deceased was afflicted with the disease at the time he made

the application for insurance and answered the questions therein, and for some time prior thereto had been so afflicted, and that he received medical attention and treatment for some ailment for a considerable time prior to the time he made the answers; that he was placed in a plaster cast within less than twenty days from the time he made the answers; and that he wrote a letter during the time he was being treated, in which letter he stated that he was in a serious condition physically, and was unable to leave Ogden, where he was being treated, and attend court at Kemmerer, Wyo. The statements stand uncontradicted and unexplained. What, then, is the natural, the inevitable, the irresistible conclusion which follows from the undisputed facts? Necessarily this: That the deceased did know, when he made the application for insurance and answered the questions, that he was seriously afflicted with some ailment, and that he then was, and for sometime prior thereto had been, under the doctor's care and treatment. It is idle to attempt to explain away that evidence, and it is equally idle to refer to cases where the nature of the disease and the facts concerning the condition and surroundings of the insured were different from what they are here. While it is true that the deceased may not have appreciated the nature of his disease, he, as the undisputed evidence shows, did know that he was seriously afflicted with some malady, and that he had not only consulted doctors, but was being treated by them therefor. The evidence thus stands uncontradicted that the deceased did conceal material facts from the defendant, and it is but fair, just, and right that the consequences of such concealment should fall upon the beneficiaries of the insured rather. than upon the defendant, and indirectly upon the policy holders.

I most cheerfully concede that it is possible that the very material and damaging statements made by the deceased in the letter, which was established by secondary evidence, might have been denied, and, if not denied, might nevertheless have been explained satisfactorily to a jury. Such was not done, however, but the statements stand admitted and

unexplained. It is idle to contend that the deceased's answers to the questions in the application constituted either a denial or an explanation of those statements. The answers cannot deny or explain away the fact that the deceased knew that he was seriously afflicted with some malady, and that he was being treated for the same, both of which facts he concealed in making the answers to the questions in the application for insurance. Therefore, unless, and until the statements contained in the letter written by him are either denied or explained, neither the jury nor the court has a right to ignore them, and if the jury does so the court nevertheless cannot evade its duty by seeking refuge behind the findings of the jury. Nor does this in any way conflict with the former opinion of Mr. Justice THURMAN. That decision turned entirely upon the question whether there was some substantial evidence to go to the jury with respect to whether the deceased at the time he made the answers in the application knowingly concealed some material fact or facts which it was his duty to disclose. We held that there was some such substantial evidence, and in arriving at that conclusion at least some reliance was placed upon the negative evidence of the deceased's neighbors. In the face of the unexplained and uncontradicted statements that he did know that he was in a serious condition, and was being treated by doctors, that evidence has been entirely dissipated, and has no probative force or effect, and there is now no alternative except to arbitrarily say that the deceased did not know what his own uncontradicted and unexplained statements show he did know or to take those statements at their face value. As the evidence stood, therefore, at the close of the last trial the condition of the case from a legal standpoint was substantially this: Assuming that A. sues B. upon a promissory note, and B. interposes the defense of payment, the burden to prove the defense being on B., and in support thereof he produces some substantial evidence of payment, but the court nevertheless, directs a verdict in favor of A. B. appeals, and this court holds that the evidence of payment should have been submitted to the jury, and on that

ground reverses the judgment. Upon another trial plaintiff's evidence is substantially the same upon the question of payment as it was upon the first trial, but B. produces a receipt in full, admitting the payment of the note in question from A., and A. neither denies nor explains the receipt. May the jury or the court ignore the receipt upon the ground that it may be a forgery or may have been obtained by duress or by fraud, etc.? Clearly not. In the absence of any denial or explanation of the receipt, both court and jury would be required to receive and consider it at its face value, and find that the debt was fully paid and discharged. To hold otherwise is to hold that verdicts and judgments need not be based upon the evidence, but may reflect merely the arbitrary conclusions of the jury, and may be based entirely upon their conjectures and caprice. When we once reach that state of affairs in the administration of law and justice, the courts had better be abrogated.

THURMAN, J. (concurring). On the former appeal I regarded this as a border-line case. The same question presented then is presented now: Was the evidence sufficient to sustain a verdict? Every reasonable doubt was solved in favor of the plaintiff's contention. Even upon questions of law we adopted a rule most favorable to the plaintiff. In doing so we were compelled to disregard numerous decisions rendered by some of the most distinguished courts of the country—decisions which hold that if the statements and answers of the insured in his application for a policy are false, the policy may be avoided without regard to the question as to what the insured knew or believed. These cases are cited in the opinion. 54 Utah 443, 181 Pac. at page 451. We adopted what we believed to be the better doctrine, especially in view of our statute (Comp. Laws, 1917, section 1154). I have no apology to make for the rule enunciated in that opinion, nor for having given plaintiff's contention, as to the sufficiency of the evidence, the benefit of every reasonable doubt. I am strongly impressed with the conviction that such is our duty in every case where we are called upon to determine such question as a matter of law.

The case, however, on this appeal presents a different aspect, especially as concerns the evidence produced at the trial.

It is assumed by my Associate with whom I disagree that the evidence before us now is substantially the same as on the former appeal. If that is true, the decision on the former appeal becomes the law of the case. As before stated, the sufficiency of the evidence was the only question then. It is the only question now. It will be conceded, however, that if the evidence on both trials of the case is not substantially the same then the rule known as the "law of the case" has no application.

The Nebraska Supreme Court, in *Phelps County Farmers' Mutual Ins. Co.* v. *Johnson,* 66 Neb. at page 592, 92 N. W. at page 577, speaking of the rule, says:

"The evidence in different cases, and in different trials of the same case, may, and often does, differ in many essential particulars. It may shift and change as the current of a stream in a bed of sand. Not only may changes occur by reason of newly discovered evidence, new witnesses whose testimony may supply a missing link, but often those having the management of a case turn the current of evidence in one direction at one time and in an entirely new channel at another. If the evidence is the same, or substantially so, and made to thus appear, doubtless the rule would apply."

On the former trial there was evidence to the effect that prior to February, 1916, the insured, Thomas Chadwick, hereinafter called deceased, was a strong able-bodied man. That during February and March of that year he was afflicted with some disease supposed to be rheumatism. He suffered considerably with pains in his back and was under the care of a physician. Some treatment was administered, but whatever it was it did not effect a cure. In March he came from his home in Wyoming to Ogden, Utah. Defendant contends he came for medical advice and treatment. Plaintiff testified he came merely to visit friends or relatives. The next heard of him, on the former trial, was when he returned home about the middle of June in a plaster cast. In August next following he died of tuberculosis of the spine. What deceased did except procure the insurance policy in

question, or what his condition was while he was in Ogden during April, May, and June, until he returned in a plaster cast, was not known, or at least did not appear in the evidence on the former trial of the case.

In considering the evidence, as before stated, this court resolved every doubt in favor of the plaintiff's contention. It was not clear to the court that the deceased, at the time he made his application for the policy in May, knew, or had reason to believe, he was afflicted with anything more than a passing ailment. Giving to the evidence every intendment favorable to the plaintiff, we were bound to find that deceased had been a strong healthy man all his life up to February, 1916; that he then became afflicted with some ailment which caused him more or less pain during February and March. We would not have been justified in finding that the ailment with which the deceased was afflicted in March, when he came to Ogden, was anything more than rheumatism of very recent origin or some similar ailment of a temporary nature. We would not have been justified in finding that the deceased knew, or had reason to believe, that he was afflicted with a disease which might seriously affect his health or impair his longevity. Besides this, we were bound to find that he had come to Ogden, in March, not for the purpose of consulting physicians or in search of medical treatment, but merely to visit friends or relatives. Such are the rules by which this court is bound; no matter what we may have believed had we been triers of the case, we were bound to give effect to every word of substantial evidence in favor of plaintiff's contention, whether it convinced our understanding or not. We were not sitting as jurors and could not consider the case from that point of view. Under these circumstances, this court on the former appeal, reversed the judgment which was entered upon a directed verdict because as the evidence then stood we considered it a case for the jury.

On the trial of the present case the testimony was absolutely conclusive that in April, 1916, deceased, instead of being in Ogden visiting with friends, as testified by plaintiff,

was in fact there under the care of a doctor, as contended by defendant on both trials of the case; that he was not only under the care of a doctor, but in a serious condition of health. This evidence did not come from company physicians or expert witnesses employed by defendant, but from the deceased himself—the one who, of all men living, had the best opportunity to know. It should be considered by this court of the highest probative value in determining the state of mind of the deceased as to the actual condition of his health. We are bound to assume that the letter written by deceased was true, in which he stated the seriousness of his condition and that he was under the care of a doctor. The unequivocal statement of deceased contained in the letter is in strict harmony with all the established facts. It is admitted he had pains in his back from which he suffered in February and March; that he returned home in June in a plaster cast, and that he died in August next following of tuberculosis of the spine. The evidence supplies a "missing link." It covers a period of time not touched by the evidence in the former trial. It makes altogether a different case. Whereas, on the former trial there was nothing except by a process of ratiocination from which it could be determined that deceased must have known his health was in a serious condition when he applied for the policy, it is now as clear as the noonday sun that he was in a bad state of health at that very time, and it is equally clear that he must have known that such was the case. As shown by the evidence, tuberculosis of the spine is a progressive disease. The victim does not improve; he grows worse until the disease culminates in death. Such is the rule. The exceptions are rare. If the deceased was in a serious condition as to health in April, he must have been in a worse condition in May, when he applied for the policy; for two weeks afterwards he was placed in a plaster cast, and two months after that he was in his grave.

As the case now stands, there is no substantial conflict in the evidence. It has become a question of law. As I view the law, I cannot concede that the statement and answers

made by deceased in his application for a policy raise a substantial conflict in the evidence. The statement made in April, if not in its nature an admission, is at least a solemn statement of fact. The statement and answers in the application made in May were self-serving, and would not have been admissible if offered by the plaintiff. They were introduced by the defendant as a matter of necessity to prove the allegations of its answer that the statements and answers were made as alleged. While there is a presumption that the statement and answers were true and sufficient to cast the burden of proof on the defendant, yet the probative effect of such presumption, when invoked as against substantial evidence to the contrary, became practically negligible for the reason above stated. They were self-serving declarations, made in his own interest, to accomplish a selfish purpose. Besides this, the statement and answers fly in the face of every well-established fact.

I am also of the opinion that statements made by the medical examiner in his confidential report as to the appearance of deceased when he was examined as a risk for insurance, under the facts of this case, are entitled to little or no consideration. It is manifest that whatever report the medical examiner made was based substantially, if not entirely, upon the false answers of the deceased. What the medical examiner concluded from the general appearance of the deceased certainly should have no weight as against the solemn statement of deceased a few days prior thereto that he was in a serious condition and under the care of a doctor. As I view the case, the admitted facts all tend to establish with unerring certainty the conclusion that when deceased made his statement and answers to the medical examiner, upon which statement and answers the policy was issued, he knew, or must have known, he was afflicted with a serious disease, and one which he believed impaired his longevity. I can arrive at no other conclusion.

Besides these considerations, there is another feature of the case, entirely new, developed on the last trial, which strengthens in a material degree the conviction that deceased

deliberately intended to mislead and defraud the defendant company. It is alleged in the amended answer of defendant that at the time the policy of insurance was applied for deceased was asked by the medical examiner, if he had ever been afflicted with rheumatism, to which question the deceased answered, "No." If there is any fact established in the case beyond the peradventure of a doubt, it is the fact that in February and March, 1916, deceased was treated by Dr. Reese for a disease supposed at that time to be rheumatism, and the deceased understood and must have known that he was being treated for that disease. When he was asked the question on May 29th if he had ever been afflicted with rheumatism, and unqualifiedly answered "No," it was not the frank candid answer of an honest man. It was misleading and disingenuous. It was calculated to deceive the medical examiner, and cause him to relax the rigor of his examination as to the physical condition of the deceased. Can any one believe that the policy in this case would have been issued at all if the deceased had frankly and honestly answered the questions asked? Is it conceivable that the medical examiner would have recommended the deceased as an insurable risk if the deceased had told him he had been treated by physicians in February and March for a disease supposed to be rheumatism, and that the disease had not responded to the treatment, and that in April he was still under the care of a doctor and in a serious condition? I have no doubt that medical examiners in these cases are, ordinarily, anxious to extend the business of the companies they represent, and probably sometimes take long chances in their recommendations; but I cannot believe that any reputable physician desirous of maintaining good standing with his employer would recommend for insurance a case of this kind if all the facts he was entitled to know, in response to the questions asked, had been fairly and honestly disclosed. We may therefore well believe the testimony of the medical examiner in the instant case to the effect that he would not have recommended the policy holder if the questions asked had been truthfully answered.

It follows, therefore, that in my opinion the policy of insurance was not procured by the deceased in good faith, believing he was entitled thereto, but was procured through fraud and misrepresentation, as to which there is no substantial conflict in the evidence. For this reason the judgment of the trial court should not be permitted to stand.

I concur in a reversal of the judgment.

GIDEON, J. By the former opinion of this court in this case it was held that the plaintiff was entitled, under the evidence then produced by her, to have the same submitted to the jury. In other words, the effect of that decision was that plaintiff had made out a prima facie case. That decision is, to that extent at least, the law of the case. It was the law of the case in the district court at the last trial. At that trial the plaintiff offered the same proof as at the former trial. The defendant was permitted to amend its answer. It produced testimony in addition to that given by it at the former trial and the same was admitted by the court. Part of this additionel proof was the testimony of one Cook, who recited the contents of a lost letter written to him by the insured in April preceding the date of the policy. In that letter the witness Cook stated that the insured wrote, in substance, that he, the insured, was then seriously ill and under the care of a doctor. The testimony of the witness Cook was not disputed by any witness. At the close of the case counsel for defendant moved for a directed verdict in its favor upon the ground that it had been conclusively shown that the deceased, at the time he made application to the defendant company, and at the time he made answers to its medical examiner, knew or believed, or had good reason to believe, that he was suffering from a disease which was prejudicial to his health and which would impair his longevity. The refusal of the court to grant that motion is the principal error relied upon. The other errors all relate to, and are dependent upon, the denial of this motion. In the judgment of the majority of the members of this court the district court should have granted that motion, and it is held to be prejudicial error not to have done so. I withhold my assent from that

conclusion, but concur in the order remanding the cause for a new trial.

WEBER, J. (dissenting). At the first trial of this case plaintiff recovered judgment, which was set aside by the district court on motion for new trial. At the second trial a verdict was directed by the court in favor of defendant, and plaintiff appealed. *Chadwick* v. *Beneficial Life Ins. Co.*, 54 Utah 443, 181 Pac. 448. As stated in the opinion by Mr. Justice THURMAN, the facts at that trial were:

"The testimony introduced by respondent tended strongly to show that the deceased was afflicted with some physical ailment as early as March, 1916, over two months before he applied for insurance; that he was in frequent consultation with a physician, and was receiving medical attention; that he complained of pain in his back and electric treatment was applied; that he was advised by the physician to come to Utah for medical advice; that he came to Ogden and consulted one or more physicians; that while there he applied for the insurance in question, and made the statements and answers which respondent relies on as a defense. It was shown by the autopsy that deceased died of tuberculosis of the spine, and in the opinion of the physician the conditions were such that deceased must have known that he was not in good health at the time the policy was applied for. It must be admitted that the evidence tended strongly to support respondent's contention, but it did not pass entirely unchallenged. The testimony on behalf of plaintiff tended to show that the deceased, who had previously been in good health and was strong and vigorous, about March, 1916, became afflicted with a pain in his back; that it was supposed to be rheumatism, in fact was so considered by the company physician who treated him; that up to the time he went to Ogden he had been attending to his farm work and logging in the canyon. Plaintiff testified that she went with deceased on one occasion to the doctor; that she did not realize her husband was seriously ill until in June, 1916; that when he went to Ogden it was not for the purpose of consulting physicians, but merely on a visit; that when he returned in July he was in a plaster of Paris cast.

"The depositions of eight witnesses, all residents of Afton, Wyo., and neighbors of deceased in his lifetime, were read in behalf of plaintiff. Each of them testified he had known deceased intimately during his lifetime. Several of them had seen him almost daily for several years previous to his death. None of them ever knew of his being sick or attended by a physician until June, 1916, or ever knew of his being unable to do his work, which was farming. The testimony of these witnesses was of a negative character. Its

probative force is for that reason limited, but that goes to the weight of the evidence only, and was therefore a question for the jury.

"It thus appears there was some substantial evidence before the court and jury to the effect that prior to March, 1916, the deceased was a strong, able-bodied man, capable of logging in the canyon and working on his farm; that in March he complained of pain in his back, and consulted Dr. Reese, who treated him for rheumatism; that he still continued to carry on his work; that he went to Ogden on a visit, and when he returned in July he was incased in a plaster of Paris cast. There is not a suggestion in any of the evidence that the deceased had reason to believe he was afflicted with anything more than rheumatism until after the policy of insurance was issued, and this affliction was of recent origin. These considerations, together with the testimony of eight of deceased's neighbors, who were intimately acquainted with him for several years before his death, and never knew him to be sick or unable to do his work, or to consult a physician in regard to his health prior to June, 1916, are sufficient in themselves to present a serious question as to whether or not the deceased, at the time he applied for insurance, believed or had reason to believe, that he was afflicted with anything more than a temporary ailment. The same rule must be applied in considering the negative answer of deceased as to the name and address of the physician last consulted. The uncontradicted evidence shows that Dr. Reese, whom the deceased consulted, treated him for rheumatism before he went to Ogden. There is no evidence that he was treated for anything else by any other physician, either in Wyoming or Utah, prior to his application for insurance. In fact there is no evidence that prior to making his application he consulted any physician at all except Dr. Reese, of Afton, Wyo. Hence it cannot be contended as a matter of law that deceased knew, or had reason to believe, he was afflicted with anything more than a temporary ailment at the time he applied for insurance."

It was held that the case was one for the jury, and that the district court erred in directing a verdict for defendant.

The only difference between the testimony at the second trial and the last, in which plaintiff obtained the judgment from which this appeal is taken, was that further testimony was introduced for the defendant at the last trial and that the defense was strengthened. If I am right in that, the former decision of this court should now be the law of the case and the present judgment should stand.

But, waiving the question of the law of the case, there is,

nevertheless, no good reason that I can perceive for reversing this judgment. The defendant, however, claims that the evidence produced by the defense was so strong and convincing that this court should, as a matter of law, hold the insurance policy to be null and void. As stated in its brief: .

"The defendant contends * * * that, in view of the testimony submitted on this trial, which was stronger and clearer than submitted at the first trial, and which stands uncontradicted, that the trial court should have directed a verdict for the defendant. We contend that, as a matter of law, the policy of insurance upon the life of this party was null and void, inasmuch as it is shown that the deceased knew, or had good reason to believe, that he was affected at the time he made his false answers to Dr. Morrell."

As I read the record, the testimony at the last trial was no more uncontradicted than at the second trial, as a review of the new or additional testimony will demonstrate.

Dr. Joseph E. Morrell, who examined Chadwick for defendant, and who did not testify at the former trial, was produced, and testified that he made the usual examination of the insured on May 29, 1916; that certain questions were asked Chadwick, the applicant; that applicant answered every question on the examiner's report, and that the answers were recorded as given; that applicant was submitted to the usual physical tests. In reply to a question on cross-examination as to whether he recalled what took place at the time of the examination Dr. Morrell testified that there were so many examinations that he could not remember what occurred. The doctor further testified that very often he took the family history and inserted it in the application, and filled out the balance of the answers after the signing of the application by the applicant; that he could not say that this was not done in this case; that there was nothing aside from the average case to bring this particular case back to his mind; that at the time of the examination of Chadwick there was nothing about him that caused the witness to notice anything out of the ordinary; that Chadwick walked naturally; that there was nothing to indicate that he was favoring any part of his body, and that there was nothing about deceased when he was examined to indicate to layman or doctor that

he was suffering from tuberculosis; that from symptoms shown by deceased at the time of examination he might have had only a passing ailment; that there was nothing about the length of time that spinal tuberculosis exists to indicate when it started or when the patient might know he had it; that from the history of the case the deceased "would not be able to tell from the history of the pain of that length of time whether it would be serious or not, because backaches are common from simpler causes."

Dr. William R. Calderwood, medical director of defendant company, in answer to a question which assumed that a person died of tuberculosis of the spine August 13, 1916, that a post mortem examination of the body of such deceased person showed two of the vertebræ to have undergone what is known as caseous degeneration, and assumed that such person had been under the care of physicians from February 1st until the middle of March, being treated about twice a week for pain in the back, such pains being more intense when such person performed manual labor, and assumed that such person was incased in a plaster of Paris cast on or about June 13, 1916, and from that time was unable to do any work around the house until his death, testified that such a person would, on the 29th day of May, 1916, know that he was suffering from a serious ailment, and one which was not merely temporary and passing, but which was prejudicial to his health and would impair his longevity. On cross-examination the witness said that if symptoms of the disease are not present so that a doctor could observe them under those conditions the patient would not know. He further said that ordinarily it took a period of years for the spinal processes to become degenerated as they were in the deceased; that before complete softening occurred it would be a 'period of months to a period of a year, all depending upon the rapidity of the disease.

Dr. Calderwood's testimony was corroborated by that of Dr. Horace G. Holbrook.

Dr. John F. Sharp, in response to an hypothetical question similar to that propounded to Dr. Calderwood, stated that

the patient would have reason to know he was not in good health, but suffering from a serious ailment that would impair his longevity. In answer to the question as to what symptoms he would look for on May 29, 1916, in the deceased, Dr. Sharp said that he would look for rheumatic pain in the region of the back and abdomen, for a tendency on the part of the patient to save himself any jars or accidents, and whether he would have a tendency to move as lightly as possible, whether he would find that doing as little as possible would make him feel best. After describing the symptoms, and at the close of the cross-examination of this witness, he was interrogated and made answers as follows:

"Q. Suppose such a patient came to you to be examined for insurance on the 29th of May, and was stripped to the waist line, and went through the movements coming into the office, and did not exhibit any of these symptoms, what would you say then? A. I cannot conceive him not exhibiting any of them. Q. I am assuming that is the case; would you say then there was anything about his condition that would cause him to believe he was suffering from anything but a passing ailment? A. If he had none of these symptoms, he would not."

It is vigorously contended by defendant that there is no escape from the conclusion to be drawn from the testimony of these doctors and from the corroborating testimony of other witnesses in the case that Chadwick on May 29, 1916, when he was examined by Dr. Morrell, had reason to believe or knew that he was suffering from a serious ailment prejudicial to his health, and which would impair his longevity. So far as the evidence of the physicians is concerned, it was greatly weakened upon cross-examination, and the statements of Dr. Sharp, as above quoted, could easily and with good reason have induced the jury to wholly disregard the expert testimony.

Junius Romney, defendant's superintendent of agents, who visited plaintiff after Chadwick's death, testified that plaintiff then stated that she and her husband had gone to consult the Drs. Reese, physicians at Afton, Wyo., and that they first diagnosed the case as rheumatism and treated him for that; that she further said that, the malady not yielding

to the treatments, the doctors informed both her and the insured that Chadwick was then suffering with tuberculosis of the spine, and advised him to go to Utah and there consult specialists; that she then further said that he went to Ogden for that purpose, and consulted Dr. Rich and others, and that she later joined him in Ogden, and that after treatment there her husband returned to Afton in a plaster of Paris case, and later died. The jury may have concluded that Mr. Romney was mistaken. They could have fairly justified such a finding upon the following grounds and for the following reasons: (a) At the former trial Romney testified, in substance and effect, that tuberculosis of the spine was not mentioned until after Dr. Reese had made his post mortem examination. (b) H. E. Booth, one of the defendant's agents who was present at the conversation referred to by Romney and whose testimony at the second trial was read at the last, testified that Mrs. Chadwick said in the presence of Romney that Dr. Reese advised her that he thought that Chadwick had rheumatic pain in the back. Booth further testified that Mrs. Chadwick said that Dr. Reese had performed a post mortem examination on her husband and said he found that the deceased had tuberculosis of the spine. (c) When plaintiff's attorney, on September 15, 1917, wrote to Dr. Reese calling his attention to the statements by the company that Chadwick had tuberculosis of the spine in May, 1916, the answer received was to the effect that Chadwick consulted Dr. Reese for a pain in the back, and that they (the Drs. Reese) gave him electric treatments. It is evident that Drs. Reese & Reese had not diagnosed the case as spinal tuberculosis, or, if they did, they failed to treat him for that disease, and failed to inform Chadwick that they had so diagnosed his case. It appears from the admission of defendant's attorney in the record in this case that if the Drs. Reese diagnosed Chadwick's disease as tuberculosis of the spine they never conveyed their thought or belief to the deceased. Neither is there any evidence that either of the Drs. Reese ever, prior to the post mortem examination, told Mrs. Chadwick that her husband was afflicted with spinal tuber-

culosis. (d) Mrs. Chadwick denied that she made the statements as testified to by Mr. Romney.

Not only is there a conflict in the evidence, but on this proposition plaintiff's evidence is so strong and convincing that it is difficult to conceive how a jury could fail to arrive at the conclusion that Mr. Romney was mistaken in that part of his testimony.

The most important testimony produced by the defense at the last trial is that of Carl Cook, who testified that as clerk of the district court at Kemmerer, Wyo., he issued a summons for the insured to attend court as a juror May 1, 1916, and that about a week or ten days before the opening of court he received a letter from Chadwick stating that the writer of the letter was in Ogden, Utah, under the constant care of a doctor; stating also that he was in a serious condition, and unable to leave Ogden to attend court. Cook testified that he had filed the letter with the court records; that he had made search for it, but was unable to find the document. It is claimed that the testimony of Cook is conclusive. If that be true, it follows that the jury's verdict is wrong, and that the court erred in failing to direct a verdict for the defendant, and abused its discretion in denying defendant's motion for a new trial. Why Cook's testimony, under the circumstances of this case, should be accepted as conclusive I am unable to perceive. There is no evidence whatever in the record except what Cook said Chadwick stated in his letter that Chadwick was under a doctor's care at Ogden before the policy of insurance in question here was issued. It is claimed that Chadwick wrote that he was in a serious condition. The record contains no evidence whatever, except this alleged admission in the letter by Chadwick, tending to show that he was actually in a serious or dangerous condition; nothing to prove that the statement had any reference to the disease from which he ultimately died. Neither is there anything in the record to show that, whatever his condition in April was, he knew, or had reason to believe, that he had not recovered entirely by the time that the examination for the insurance was made. The fact that Cook

testified that a letter was received by him does not make his testimony any stronger, or any more convincing, than if had testified to verbal admissions, as the letter was not produced. Cook's testimony, therefore, was nothing save uncorroborated testimony of inconsistent declarations by Chadwick. The letter was received some time in April asking to be relieved from court attendance in May. According to Cook's testimony, Chadwick claimed to be under the constant care of a doctor. From other testimony, and from a certificate attached to the letter by Dr. Freenor, a chiropractor, it may be reasonably inferred that he was taking chiropractic treatments, and not that he was under the care of a doctor constantly or otherwise. As he apparently was in good health on May 29th, when examined for insurance, as shown by Dr. Morrell's confidential report to the company, it is a justifiable, if not a necessary, inference from the evidence that Chadwick had obtained at least temporary relief from the chiropractor, and had been induced by the chiropractor to believe that that relief meant a permanent cure; that on that date he, in good faith, believed that he had suffered from a passing ailment or temporary indisposition only, and that at the examination he believed himself to be in good health and had good reason for such belief.

The answers made by Chadwick when examined for insurance are presumed to be true, and the burden was upon the defendant to prove their falsity. Not only is the burden of proof upon defendant, but the evidence to establish fraud must be clear and convincing. *Wingo* v. *New York Life Ins. Co.* (S. C.) 101 S. E. 653. The fact that Chadwick in a letter to Cook made declarations inconsistent with his answers to the company's question was not necessarily conclusive, but it was for the jury to say whether it was sufficient proof to overcome the presumption that Chadwick's answers were truthful. In *McEwen* v. *New York Life Ins. Co.*, 183 Pac. 373, decided by the District Court of Appeals, Second District, Division 1, California, July 9, 1919, rehearing denied by Supreme Court September 4, 1919, the effect of declarations made in response to questions at the time of exam-

ination for insurance, and of admissions by the insured prior to obtaining the insurance, is discussed, and what is said is applicable here. The court said:

"In response to question 8, 'How long since you considered or have had the care of a physician?' McEwen's answer was, '1891; Dr. Thomas, Bucyrus, Ohio;' and in response to question 9, 'If so, for what ailment; name and address of physician?' the answer was, 'Typhoid fever.' The verdict that the answers to these questions were true is attacked by appellant upon the ground that the evidence is insufficient to support the same. The declarations made by the appellant in response to the questions are presumed to be true, and hence the burden was upon defendant to prove the contrary. The only evidence adduced on the part of defendant tending to overcome the presumption so attaching to the answers given by McEwen was the testimony of one Hosick to the effect that McEwen, after an occasion when he was said to have been drunk, told him that he had been under a doctor's care ever since, and the testimony of Dr. Garrett that on August 18, 1909, McEwen stated to him, while acting in the capacity of medical examiner for an accident insurance company, that he (McEwen) was under treatment from Dr. Taylor, which fact of being under Taylor's treatment McEwen also stated in the notice of an injury sustained which he gave to the accident insurance company. It thus appears that, in determining the issue, all that the jury had before it was the declaration of McEwen made in his application to defendant, to which a presumption of its truth attached, and subsequent * * * declarations insufficient as evidence to overcome the presumption of truth attaching to the answers made by McEwen in his application for the policy."

The court further said:

"The only evidence tending to show the falsity of McEwen's answer, 'No,' to question 6, 'Have you ever raised or spat blood?' is a statement made by him to Dr. Garrett to the effect that he had, following an injury from being kicked or struck in the chest by the foot of a mule, spat blood. The representation made to the insurance company must, in the absence of sufficient proof to overcome the presumption, be deemed to be true, and we cannot say that it is overcome by an inconsistent statement therewith made by McEwen. As to the special verdict rendered in response to this question no ground appears for complaint, since the jury, in weighing the inconsistent declarations, decided in favor of the one presumed to be true as against one as to which no such presumption existed."

At the last trial the defendant introduced in evidence the

medical examiner's confidential report to defendant. This report shows the "vigor and general appearance" of the insured to be "erect and healthful" and gives other information not contained in the answers made to the medical examiner—the report being a favorable account of Chadwick's health. These statements by the examining physician, who was the representative of the company, were statements of the company itself, and are the admissions of the company itself, and are testimony for plaintiff. It was for the jury, and not for the trial court or this court, to say what weight should be given to the company's admissions as well as what weight should be given to the admissions made by Chadwick in the letter to Cook.

In *McGowan* v. *Supreme Court, Ind. Order of Foresters,* 104 Wis. 173, 80 N. W. 603, it is said:

"The examining physician, who was an officer of the local court of Galena, made a personal examination of Pyon at the time of his application, and made a long written report, in answer to questions, as to Pyon's physical condition, in which he gave a very favorable account of his health. This report was offered in evidence by the defendant on the trial, in connection with, and as part of, the application. Thereafter the plaintiff asked one of the medical experts a hypothetical question based on the facts stated in the physician's report, and the defendant objected, on the ground that the paper was no evidence of the facts stated in it, but only of the fact that such a repor was made. The court overruled the objection, and held that the statements in the report were in the nature of admissions by the company of the facts therein stated, not conclusive, but competent to go to the jury on the subject. We think the ruling was correct. The statements were made by one of the defendant's officers, as a part of his official duties, and within the scope of such duties. Such statements are plainly statements of the company itself, and must be regarded as upon the same plane as the admissions of agents generally, made during the transaction of the agency business, and within its scope, which are deemed part of the res gestæ. 1 Jones, Ev. section 256."

For this court to say that Cook's testimony must be accepted as conclusive is, in my opinion, a clear invasion of the province of the jury. It is resolving the conflict between the evidence produced by plaintiff and that produced by appellant in the latter's favor. It is a substitution of the

court's judgment on the weight of the evidence for that of the jury.

I think the judgment should be affirmed.

On Application for Rehearing.

CORFMAN, C. J.   Plaintiff has filed a petition for rehearing.   It is asserted by counsel that the members of the court concurring in a reversal of the judgment misconceived and misinterpreted the testimony of certain witnesses, particularly the testimony of the physicians who testified in behalf of the defendant.   We think the record fully justifies all that has been said in the concurring opinions with regard to this testimony, and that a further review would be useless and unavailing.   It will suffice to say that the testimony of the physicians, although an important factor in the case, was not treated nor regarded alone as controlling nor determinative in arriving at the findings of fact and conclusions of law upon which the judgment of reversal is predicated.

It is further contended that each of the concurring members of the court founded his separate opinion upon the testimony of Carl Cook, a witness who testified to the written admissions made to him by the insured concerning his health shortly before the policy was written.   Again, we do not think a careful reading of the opinions justifies the conclusion arrived at by the counsel.   However, as counsel insist we attached too much importance to the testimony of this particular witness, and that his testimony was merely hearsay, and therefore erroneously admitted by the trial court over plaintiff's objection, we have taken the pains to examine the following cases and authorities cited and relied on by plaintiff in support of her contention: 7 Ann. Cas. 647, 648; *Taylor* v. *Grand Lodge A. O. U. W.,* 101 Minn. 72, 111 N. W. 919, 11 L. R. A. (N. S.) 92, 118 Am. St. Rep. 606, 11 Ann. Cas. 260; 14 R. C. L. 1438; *McGowan* v. *Supreme Court I. O. F.,* 104 Wis. 173, 80 N. W. 603; *Valley Mut. Life Ass'n* v. *Teewalt,* 79 Va. 421; *Schwaizbach* v. *Ohio Valley Protective Union,* 25 W. Va. 622, 52 Am. Rep. 227; *Mobile Life*

*Ins. Co.* v. *Morris*, 3 Lea. (Tenn.) 101, 31 Am. Rep. 631; *Holland* v. *Taylor*, 111 Ind. 121, 12 N. E. 116; *Penn Mut. Life Ins. Co.* v. *Wiler*, 100 Ind. 92, 50 Am. Rep. 769; *Supreme Lodge K. of P.* v. *Schmidt*, 98 Ind. 374; *Rawson* v. *Milwaukee Mut. Life Ins. Co.*, 115 Wis. 641, 92 N. W. 378; *Supreme Lodge of Knights of Honor* v. *Wollschlager*, 22 Colo. 213, 44 Pac. 598; *Union Central Life Ins. Co.* v. *Cheever*, 36 Ohio St. 201; *Fraternal Mut. Life Ins. Co.* v. *Applegate*, 7 Ohio St. 292; *Granger's Life Ins. Co.* v. *Brown*, 57 Miss. 308, 34 Am. Rep. 446; *Edington* v. *Mut. Life Ins. Co.*, 67 N. Y. 185; *Dilleber* v. *Home Life Ins. Co.*, 69 N. Y. 256, 25 Am. Rep. 182; *Washington Life Ins. Co.* v. *Haney*, 10 Kan. 395; *Lazensky* v. *Supreme Lodge Knights of Honor* (C. C.) 31 Fed. 592.

Most, if not all, of the above cases will be found cited in the foot notes supporting the text of 14 R. C. L., and in the editorial notes of 11 L. R. A. (N. S.) supra. If the texts of these authorities properly reflect the decisions of the courts, as we think they do, the contention made by plaintiffs in the case before us finds no support whatever.

The case note of *Taylor* v. *Grand Lodge A. O. U. W.*, 11 L. R. A. (N. S.), supra, reads:

"It may be laid down as a general rule, established by the weight of authority, that, where the defense in actions on contracts of life insurance is based upon the alleged falsity of statements contained in the application, admissions, or declarations of the assured, whether made before or after the policy was issued, will not be admissible against the beneficiary, *unless they were made at a period not too remote in time from the making of the contract of insurance, and were of such nature as to be of real probative force in determining the truth or falsity of such statements;* apparently upon the ground that the contract of insurance is between the insurer and the beneficiary; that the assured is not a party to the suit; and that the beneficiary has a vested interest in the policy of which he cannot be deprived by the insured except by some act in violation of a condition of the policy." (Italics ours.)

To the same effect will be found the text of 14 R. C. L. p. 1438, section 601, supra; 5 Joyce, Law of Ins. section 3819; *Kelsey* v. *Universal Life Ins. Co.*, 35 Conn. 225; *Haughton* v. *Ætna Life Ins. Co.*, 165 Ind. 32, 73 N. E. 592, 74 N. E.

Certiorari.   Award Sustained

613; *Swift* v. *Mass. Mutual Life Ins. Co.*, 63 N. Y. 186, 20 Am. Rep. 522; *Welch* v. *Union Central Life Ins. Co.*, 108 Iowa, 224, 78 N. W. 853, 50 L. R. A. 774.

In the case at bar the contract sued upon was between the defendant company and the assured, not between the insurance company and the plaintiff, the beneficiary named in the policy. The plaintiff, therefore, had no vested interest in the policy. The representations and declarations of the assured concerning his health, made at or about the time of his procurement of the policy, were material. The letter in question was written by the assured very shortly before the policy or contract of insurance was entered into by the assured and defendant. We think it was properly admitted by the district court in the trial of the case, and as to its probative value in arriving at the truth, under all the circumstances attending the case, there cannot be the possibility of a doubt.

The application for a rehearing is denied.

FRICK and THURMAN, JJ., concur.

GIDEON, J., concurs in the order denying a rehearing.

WEBER, J., dissents.