FIDELITY & CASUALTY CO. OF NEW YORK
v. MIDDLEMISS.

No. 6501.   Decided March 30, 1943.   (135 P. 2d 275.)

Rehearing denied June 28, 1943.

*D. N. Straup*, *Willard Hanson*, and *Stewart M. Hanson*, all of Salt Lake City, for appellant.

*Hurd & Hurd* and *E. B. Cannon*, all of Salt Lake City, for respondent.

McDONOUGH, Justice.

Defendant and appellant, who was the counterclaimant in the court below, appeals from a judgment of nonsuit and dismissal entered against him. Plaintiff insurance company instituted the action to rescind and cancel a policy of health and accident insurance issued January 8, 1940, to Dr. William R. Middlemiss. Defendant counterclaimed for $20,000 for loss of the sight of his right eye alleged to have been caused by an accident sustained after the policy was issued.

The only question for our determination is whether the trial court erred in granting the motion for dismissal against defendant on his counterclaim. Both by its complaint and by its reply to the answer and counterclaim, plaintiff claimed misrepresentations and false statements material to the risk were made by defendant in procuring the policy. Plaintiff particularly claimed misrepresentation of material facts in answers to questions 17, 18 and 19 of the application:

"17. Are you in sound condition mentally and physically? Yes
"18. Have you any mental or physical defects not specified above? No
"19. Have you received medical or surgical advice or treatment at any time during the last five years or have you been disabled at any time during that period? No"

The policy was issued without any medical examination. The only information obtained by the insurance company as to the physical condition of the applicant which might enable the company to make any determination as to the soundness of the risk for which insurance was sought, consisted of the answers to questions made by appellant in his application. The policy contains a copy of such application, and under "General Provisions" appears the following:

"7. This policy is issued in consideration of the premium charged therefor and of the statements made in the application, a copy of which is endorsed upon and is hereby made a part of this contract.

The falsity of any statement in the application for this policy materially affecting either the acceptance of the risk or the hazard assumed hereunder, or made with actual intent to deceive shall bar all right to recovery under this policy. * * *"

By the terms of the policy appellant was insured against

"Bodily injury sustained during the term herein specified, through accidental means, and resulting directly, independently and exclusively of all other causes, in —* * * (c) Dismemberment and Loss of Eyesight (as specified in Article 1) sustained within twenty-six weeks from the date of the accident. * * *"

For the loss of the "sight of one eye" a sum equal to the weekly indemnity of 200 weeks is payable, which at the rate of $100 per week would amount to $20,000. "Loss shall mean: * * * with regard to eyes, the irrecoverable total loss of sight."

In determining the propriety of granting a motion for involuntary nonsuit the evidence must be considered from a view most favorable to the party against whom the dismissal is sought.

By his pleadings and testimony, appellant denied that the answers to questions 17, 18 or 19 were false, and he claimed proper answers were made to the questions. The respondent company contends the answers were not only false, but that the doctor knew the information sought by the questions was material to the risk; and that had he given correct information, an investigation would have been invited which would have resulted either in rejection of the application or exclusion of the defective eye from coverage under the policy.

When 5 or 6 years of age an open safety-pin pierced the right eye of the insured, and a cataract developed which was removed by a needling operation. As a result, the lens was destroyed, and he had an uncorrected vision in the right eye of 20 per cent or less. In 1918 he had an operation performed to shorten the internal rectus muscle because the eye had started to turn. He wore glasses, but

the lens for the right eye was a blank. A strong magnifying lens could substantially restore or correct the vision lost by destruction of the lense of the right eye, but corrected vision in that eye could not be coordinated with that of the left eye. With a correction lens for the right eye he would likely see double.

He wore glasses since childhood, and got along all right in high school, university, and medical college, as well as in the practice of medicine and surgery for more than 18 years, notwithstanding the impaired vision of the right eye for the reason he relied on the left eye for acute vision. In 1938 Dr. Callahan, an eye specialist, tested his left eye for a correction in the lens for the left eye, but he did nothing to correct the right eye for the reason above stated. It appears from the evidence that prior to the accident in 1940, if the sight of the left eye had been accidentally destroyed, a lens could have been fitted for the right eye to give Dr. Middlemiss acute vision and substantially normal sight in the right eye.

On January 8, 1940, when defendant applied for the health and accident policy he was not only a physician and surgeon, but he was representing various insurance companies in conducting medical examinations of applicants for both life insurance and health and accident policies. He was conscious of the greatly reduced vision of his right eye, and he was interested in the proper care of his eyes. At the time he answered the questions he recognized the fact he had suffered a serious injury to his right eye; and he admitted that he realized insurance companies are interested in obtaining information affecting longevity and disability. He claimed, however, that he was able to do his work without difficulty or handicap, and he was then enjoying good "general health," and since the questions were general he considered the answers he gave were true in a general way. He testified that no question was specifically directed to his eyes, and that he had no intent to deceive. The defective condition of his right eye could not be detected by the or-

dinary layman. He made no disclosure of the defect to his right eye which was one of the particular parts of his body to be covered by insurance. He admitted that the risks assumed in accident policies are in some respects greater than in life insurance, and that such companies are interested in knowing about defects which tend to affect the risks. He testified that he did not consider the condition of his right eye affected the risk, as he was chiefly concerned with protection against loss of time from illness.

When he received the policy he read it over and returned it because he believed it did not afford him all the protection he wanted. After discussing the provisions with a representative of the local agents he decided to keep the policy and he issued another check for the premium to replace the original check on which he had stopped payment. He then placed the policy in his safety-deposit box and did not read it again until a few weeks before this controversy arose.

On July 24, 1940, he drove his car south on Ninth East street in Salt Lake City. While stopped behind a line of vehicles waiting for a green light at Eighth South street, a car crashed into the rear of his car, and the impact caused his head to be thrown forward, and the right side of his face at the angle of the eye struck the knob on the steering wheel. He claimed he felt a sharp flash of pain for an instant, his glasses moved upward from the blow, but were not broken. Resulting swelling on the right side of his face receded upon the application of cold packs.

While the eye appeared to respond to the treatment for a time, it gradually became worse and hardened and the tension increased until it became so painful he had to go to the hospital for treatment. An operation was performed shortly after he was treated at the hospital to relieve the tension and save the eyeball. The eyeball was saved, but the balance of the sight in the right eye was entirely gone when he was examined after the bandages were removed.

Over two months after the alleged injury on July 24th and just prior to the time he went to the hospital, Dr. Middlemiss informed Mr. Peck, a representative of the general agency through which the policy had been procured, that he was having trouble with his right eye, which he believed resulted from an accident sometime before, and that he would make a report when he got out of the hospital. He claimed he did not know he had entirely lost the sight of the right eye until he returned from the hospital. The claim was made on October 23, 1940, under the policy for loss of sight. The insurance adjuster made an investigation. and the doctor was requested to submit to a medical examination by Dr. Bascom W. Palmer, an eye specialist. During a slit-lamp examination the defendant was interrogated about the evidence of an old penetration of the right eye, and made a disclosure of the early childhood accident and operation which resulted in damage thereto. That was the first information obtained by or on behalf of the insurer as to the prior defective condition of the right eye.

Dr. Callahan, in addition to corroboration of the testimony of Dr. Middlemiss as to the testing of the left eye in 1938 without making any correction for the right eye and the medical and surgical treatment after the accident of July 24, 1940, testified in substance that in his opinion the blindness of the right eye arose out of conditions caused by the accident of July 24th. We need not detail his testimony which might have a qualifying effect on his stated opinion.

The insurer denied liability not only on the ground that claim was not made within twenty days after the accident, but also on the ground that appellant gave answers which were false and which materially affected the risk. The insurance company offered to return the premium and subsequently commenced the action to cancel the policy.

Appellant contends he proved facts amounting to a prima facie case on his counterclaim for recovery under the policy for total loss of sight of an eye. He contends that the

answers to questions 17, 18 and 19, even if false, were only representations and not warranties; that respondent had the burden of pleading and proving appellant had an intent to deceive or to defraud; that such pleading and proof are wanting, and that the trial court therefore erred in taking the case away from the jury. We need not consider the arguments of respondent that the claim was not filed within time, nor that for all practical purposes the loss of eyesight insured against had occurred before the application for insurance was signed.

The case can be disposed of on the ground that the representations that Dr. Middlemiss had no physical defects were known by him to be untrue when made, and that by reason of his training and employment he knew the materiality of the defect to his right eye in relation to assumption of risk. Regardless of how good a case a complaining party may initially present, if during the course of the trial he establishes proof of a valid defense to the action and shows as a matter of law that he is not entitled to recover, there is nothing to be submitted to the jury for determination.

In *Chadwick* v. *Beneficial Life Insurance Co.*, 54 Utah 443, 181 P. 448; Id. 56 Utah 480, 191 P. 240, this court held that if the insured at the time of making application for a policy of life insurance knows or has good reason to know he is afflicted with a disease which renders his condition serious and that his longevity is thereby seriously impaired, his representations to the contrary in response to specific inquiries, constitutes a fraud practiced on the insurer which invalidates the policy when properly proved.

The appellant here contends that the statements he made were only general responses to "general questions," and not responses to specific inquiries concerning his eyes. He argues that a general answer in the negative was proper, also because he was able to do all his work as a physician and surgeon notwithstanding the defective condition of his right eye. The argument is specious. He was asked

whether he had any physical defect. He was not asked for an opinion as to whether any defect he knew he had might affect his insurability. Even if the question was general as he contends, he well understood that it inquired into the existence of any physical defect, and he knew he had a seriously defective right eye.

The question required the doctor to state whether or not he then had any physical defect. An affirmative answer would invite further inquiry and investigation as to the particulars. The insurer could then exercise its own judgment and make its own decision as to whether it should accept the risk, increase the premium rate, or except the defective eye from coverage under the policy contemplated. It is true that at the time he filled out the application Dr. Middlemiss was engaged in conducting physical examinations of applicants for insurance in other companies, and that he made recommendations as to the insurabality of persons examined. However, that did not give him any right to withhold information in his own application for insurance nor authorize him to make any decision for the respondent insurer as to whether it should insure him against total loss of the sight of an eye already defective. He assumed the right to give false and misleading information in relation to one of the risks to be insured. No amount of argument can alter the fact that he falsely informed the insurer he then had no physical defect when he well knew he had a defective right eye in which the lens had been destroyed years before and at least 80 per cent of the vision had been lost, and that the vision of the damaged eye could not substantially be restored to normal for use in coordination with the left eye.

Appellant urges that even if he gave false information in view of his knowledge of the defective condition of his right eye, his answer was a mere misrepresentation and not a warranty against any and all defects, and that in the absence of any intention to defraud, such misrepresentation cannot prevent recovery. There is no merit to such a con-

tention where the known misrepresentation is material to the risk and the insurer acts solely on such representations. In *Eklund* v. *Metropolitan Life Ins. Co.*, 89 Utah 273, 57 P. 2d 362, 366, the trial court directed a verdict in favor of the insurance company on proof that the applicant who obtained policies without medical examination knowingly made false statements as to the condition of her health and as to whether she had been under the care of a physician at any time during a period of three years prior to date of application. This court said in affirming the judgment:

"* * * In the applications for insurance, as heretofore set out, the assured stated that she had never been under treatment in any hospital; that she had not been under the care of any physician within three years; she declared that these statements were true and complete and that any misrepresentation would render the policy void. These statements were false. Her application for the first policy was made November 2, 1933, less than a month after the last date she had been treated by Dr. Quick. The application for the second policy was made the 31st of January, 1934, two days after assured had been treated by Dr. Taufer at the Salt Lake General Hospital. The statements which the assured made were material to the risk. The policies were issued without any physical examination of the assured. Whether the company would issue the policies was dependent upon the answers of the assured. The utmost good faith to answer truthfully was required of her. On the assumption that the statements in the applications were true, the policies were issued. By making the false representations, which the assured did, the company was misled to its prejudice. Whether we class the statements made by the assured as representations or warranties, the same result is reached so far as the facts of this case are concerned. If a representation is material to the risk and likewise knowingly false, it will be as potent for a rescission of the contract embodied in the policy as if the untrue statement was made in form a warranty. * * *

"The evidence that the policies were obtained by misrepresentation being uncontradicted and it being possible to draw only one inference from it, there was presented a question of law for the court and not a question of fact for the jury."

A material representation is one which ordinarily would influence a prudent insurer in determining whether to accept or reject a risk, or in fixing the amount of premium in the event of such acceptance, or in excepting some risk or part thereof from coverage. As stated in *Zolintakis* v. *Equitable Life Assurance Society*, 10 Cir., 97 F. 2d 583 at 586:

"A misrepresentation will not constitute a defense to an action on a policy of insurance unless it was intentionally untrue or was made with a reckless disregard for its truth or falsity. Where an insured knowingly makes a material misrepresentation, proof of an actual, conscious purpose to deceive is not necessary.

"A material fact is any fact, the knowledge or ignorance of which would naturally influence the insurer's judgment in making the contract, in estimating the degree and character of the risk, or in fixing the rate of insurance."

On the second appeal, 10 Cir., 108 F. 2d 902 at 906, the Circuit of Appeals added:

"One cannot knowingly conceal or misrepresent facts which one knows would influence the risk or the issuance of the policy, and then be heard to say that he did not intend to deceive or defraud. The pronouncements of this court in the former decision follow the law as declared in the Chadwick case by the Supreme Court of Utah."

There can be no doubt in this case as to the fact that Dr. Middlemiss knew or should have known in the light of his training, experience and skill, that his negative answer to an inquiry as to the existence of any physical defect, constituted not only a misrepresentation of a material fact, but also a misrepresentation which materially affected acceptance of his right eye as a subject for insurance and special indemnity. He was conscious of the existence of a greatly defective right eye. He knew of the type and character of the risks covered by his policy before he accepted it, for he read it over and objected to its alleged restrictive coverage before he paid the premium. He knew that one of the risks against which he would be insured was total loss of the sight of an eye. A copy of his applica-

tion was a part of the policy, and he knew the insurer relied solely on his statements in issuing the policy. His training, knowledge and skill as well as his professional employment by insurers, were such that he could not help but know that a company would at least hesitate to insure against total loss of sight of an eye already damaged and the vision of which was seriously impaired. By virtue of his knowledge and professional connections he was bound to know that an insurer in possession of the facts it solicited as answers to questions, would not likely insure his damaged right eye, if at all, at the same rate or on par with a normal uninjured eye.

The evidence produced by and on behalf of appellant established a sufficient defense to recovery under the policy by proof of a known misrepresentation of an important fact material to the risk. The trial court did not err in granting respondent's motion for involuntary non-suit. The judgment is therefore affirmed, with costs to respondent.

WOLFE, C. J., and MOFFAT, J., and GEORGE A. FAUST, Dist. Judge, concur.

LARSON, J., concurs in the result.

PRATT, J., on leave of absence.