**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CLEARONE COMMUNICATIONS,
INC., a Utah corporation, and
EDWARD DALLIN BAGLEY,

      Plaintiffs-Appellants,

    v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA, a
Pennsylvania corporation,

      Defendant-Appellee.

No. 05-4294

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CV-119-TC)**

---

Raymond J. Etcheverry, Parsons Behle & Latimer, Salt Lake City, Utah, for Appellant Clearone Communications, Inc., and Jefferson W. Gross, Burbidge & Mitchell, Salt Lake City, Utah, for Appellant Edward Dallin Bagley (Kent O. Roche, Parsons Behle & Latimer, Salt Lake City, Utah, and Richard D. Burbidge and Robert J. Shelby, Burbidge & Mitchell, Salt Lake City, Utah, with them on the briefs).

Roy G. Weathercup, Lewis Brisbois Bisgaard & Smith, LLP, Los Angeles, California for Appellee (Douglas R. Irvine and Matthew L. Seror, Lewis Brisbois Bisgaard & Smith, LLP, Los Angeles, California, and Phillip S. Ferguson and Anneliese C. Booher, Christensen & Jensen, P.C., Salt Lake City, Utah, with him on the brief).

Before **HENRY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **TYMKOVICH**, Circuit Judge.

**TYMKOVICH**, Circuit Judge.

National Union Fire Insurance Company of Pittsburgh, Pennsylvania rescinded an executive liability insurance policy it issued to ClearOne Communications, Inc. based on misrepresentations in financial statements accompanying ClearOne's application for the insurance. ClearOne filed suit challenging National Union's action. The district court granted summary judgment in favor of National Union, concluding National Union properly rescinded the insurance policy in its entirety under Utah law. *Clearone Communs. Inc. v. Lumbermens Mut. Cas. Co.*, 2005 U.S. Dist. LEXIS 26187 (D. Utah Oct. 21, 2005). On appeal, ClearOne and one of its directors argue that (1) fact questions remain as to whether ClearOne knowingly misrepresented its financial condition in the insurance application, and (2) the district court erred in interpreting the insurance policy's severability clause and scope of loss provisions.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and AFFIRM in part and REMAND for further proceedings.

## I. Background

### A.    Facts

ClearOne is a publicly-held, audio conferencing products company in Salt Lake City, Utah.  National Union of Pittsburgh, Pennsylvania provides comprehensive commercial insurance policies for businesses.  Edward Bagley is ClearOne's single largest shareholder and is on the board of directors.

In September 2002, ClearOne applied for a Directors & Officers (D&O) liability policy with National Union.  As part of the process, ClearOne was required to complete an insurance application.  One question asked applicants to provide copies of various documents or to indicate whether the documents are available on the Internet, including a 2002 10-K Form.  *See* Question 14, Aplts. App. at 3680.  ClearOne directed National Union to its website to obtain: (1) the "latest 10K report filed with the [SEC]"; (2) the "latest interim financial statement available"; and (3) "all registration statements filed with the SEC . . . within the last twelve months."  *Id.*  Furthermore, in response to other questions seeking a list of the applicant's executives, ClearOne responded, "See 10K."  *See* Question 4(a) and (b), *id.* at 3677–78.  In bold capital letters, the application declares, "All written statements and materials furnished to the insurer in conjunction with this application are hereby incorporated by reference into this application and made a part hereof."  *Id.* at 3681.

3

The application also includes a severability clause. Provision 15 of the application states,

> It is further agreed that in regard to the applicability of questions 8, 9, and 10 above,[1] the facts pertaining to any knowledge possessed by any Insured (other than the knowledge and/or information possessed by the person(s) executing the application) *shall not be imputed to any other* Insured Person; only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer [CEO], chief operating officer [COO], chief financial officer [CFO] and General Counsel . . . of the Organization shall be imputed to the Organization.

*Id.* at 3680 (emphasis added).

The application was signed by Frances Flood, the President and CEO of ClearOne, on behalf of the corporation. As part of the application, she warranted, "The undersigned authorized officer/manager of the applicant declares that the statements set forth herein are true." *Id.*

Upon receipt of the application, National Union undertook a review and analysis of the documents. National Union thoroughly examined the 10-K, the

---

[1] *Question 8* asks, "Has there been or is there now pending any claim(s) or actions against or investigation(s) of: (i) the Applicant . . .; and/or (ii) any person proposed for insurance in his or her capacity as an Executive of . . . the Applicant . . . ." Aplts. App. at 3678.

*Question 9* requires the Applicant to warrant that "(a) No Executive has knowledge or information of any act, error or omission which might give rise to a Claim or Crisis under the proposed policy . . . . (b) [T]he Applicant . . . has [no] knowledge or information of any act, error or omission which might give rise to a Securities Claim or Crisis under the proposed policy. . . ." *Id.*

*Question 10* asks a series of questions regarding potential liabilities that may give rise to a claim under the Policy. *Id.* at 3679.

4

10-Q, and other financial documents provided by ClearOne. After reviewing ClearOne's documents, National Union had additional questions about the financial statements. Brady Head, a Senior Vice President of National Union, emailed a ClearOne representative asking specifically if the company certified its financials as required by Sarbanes-Oxley and if there were any non-compliance issues with respect to its revenue recognition practices. Head received answers to those questions in a conference call with Susie Strohm, ClearOne's CFO, who indicated there were no non-compliance issues and the financials were certified. National Union issued a D&O policy to ClearOne valued at $3 million to run from October 29, 2002 until October 29, 2003.

In early 2003, ClearOne publicly acknowledged that its financial statements for the previous two years were not reliable, later admitting that shareholders' equity and net income had been substantially overstated.[2] The overstatement

---

[2] On January 21, 2003, ClearOne issued a press release which stated:

> At this time, the Company's financial statements for the fiscal years ended June 30, 2001, and June 30, 2002, and for the quarters ended March 31, 2001, through and including Sept. 30, 2002, are under review. At this time, investment decisions should not be made based on these financial statements, or on the auditor's report included in the Company's 2002 Annual Report as filed on Form 10K. In addition, the guidance given by the Company on Oct. 23, 2002, for the fiscal year ending June 30, 2003, should be treated in the same manner.

*Clearone Communs. Inc. v. Lumbermens Mut. Cas. Co.*, 2005 U.S. Dist.
(continued...)

5

arose from ClearOne's revenue recognition practices.  ClearOne entered into

distributor agreements with a policy of recognizing revenue when the product was

2(...continued)
LEXIS 26187 at 23–24 (D. Utah Oct. 21, 2005).

In its August 18, 2005 10-K filing with the SEC, ClearOne restated
its financials for the fiscal years 2001, 2002, and 2003, and offered an
explanation for the restatement.  The 10-K filing read:

> This report contains . . . our restated audited consolidated
> financial statements for the fiscal years ended June 30, 2002 and
> 2001. In connection with the restatement, we performed a
> comprehensive review of our previously issued consolidated
> financials statements for fiscal years 2002 and 2001 and
> identified a significant number of errors and adjustments. The
> restated consolidated financials statements . . . resulted in
> cumulative net reductions to stockholder's equity as of June 30,
> 2002 and 2001 of approximately $17.4 million and approximately
> $3.8 million, respectively, and reductions in previously reported
> net income for the years ended June 30, 2002 and 2001 of
> approximately $14.1 million and $3.9 million,  respectively.

*Id*. at 24–25.

ClearOne gave this explanation for its errors:

> We have a material weakness with respect to accounting for
> revenue recognition and related sales returns, credit memos, and
> allowances. Our accounting policies and practices over revenue
> recognition and related sales returns, credit memos, and
> allowances were inconsistent with generally accepted accounting
> principles in the U.S. (GAAP) . . . .  Related sales returns and
> allowances, rebates, and accounts receivables were also misstated
> as a result of the errors in revenue recognition.

*Id*. at 25.  For a detailed account of ClearOne's accounting
irregularities, see *id*. at 11–24.

6

shipped to distributors. It required distributor payments within 90 days, but the common practice was to permit distributors to remit payment for the products if and when the products were subsequently sold. This practice was known as "pay as you go" or "pay as you sell" and led to the accelerated recognition of revenue not yet received.

The admission of financial irregularities precipitated several shareholder suits and an investigation by the SEC. In anticipation of these matters, ClearOne notified National Union as a prelude to tendering a claim under the policy. In response, National Union announced its intention to rescind the insurance contract *ab initio* based on the 2002 financial misstatements, which it relied on in issuing the policy.

ClearOne later entered into a consent decree with the SEC, enjoining any future securities law violations without admitting any guilt. Based in part on National Union's refusal to honor the D&O policy, ClearOne also settled a class action suit by its shareholders, paying $5 million and issuing 1.2 million shares of common stock to the class plaintiffs.

## B. Procedural History

ClearOne and Bagley brought this diversity action to enforce their rights under the $3 million D&O liability insurance policy. They each asserted a breach of contract claim and a tort claim based on bad faith, and both sought punitive damages. Bagley's claims specifically relate to the dilution of his ownership

7

share based on the distribution of additional company shares as part of the settlement of the class action suit. He claims that the issuance of the 1.2 million shares of ClearOne stock diluted his ownership and effectively forced him to contribute a portion of his shares in the company to the settlement. National Union's principal defense is that it properly rescinded the policy after discovering it had issued the policy in reliance upon material misrepresentations made by ClearOne in its insurance application and related materials.

Both sides filed cross motions for summary judgment and partial summary judgment. In granting summary judgment for National Union, the district court (1) held National Union properly rescinded the insurance policy in its entirety under Utah law, and (2) rejected Bagley's claims since he suffered his loss in the capacity of a shareholder and not as a ClearOne director. The court's rulings rendered moot the other summary judgment motions.

Both ClearOne and Bagley appeal the decision.

## II. Standard of Review

We review the district court's grant or denial of summary judgment de novo, applying the same legal standard that the district court applied. *Montero v. Meyer*, 13 F.3d 1444, 1446 (10th Cir. 1994). Under that standard, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

8

judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim." *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006) (internal quotation omitted). On an appeal from a motion for summary judgment, we construe all factual inferences in favor of the party against whom summary judgment was entered. *NISH, Inc. v. Rumsfeld*, 348 F.3d 1263, 1266 (10th Cir. 2003).

In addition, we review the district court's interpretation and determination of state law de novo. *Freightquote.com v. Hartford Cas. Ins.*, 397 F.3d 888, 892 (10th Cir. 2005). "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006) (internal quotation omitted).

### III. Analysis

ClearOne contends the district court erred by misapprehending (1) the elements of rescission under Utah law, (2) the severability clause's effect on rescission, and (3) whether any claims survive rescission. We consider each contention in turn.

9

**A. Rescission**

Starting with the rescission claim, ClearOne first contends it never gave an unqualified warranty that its financials were accurate, and therefore no misstatement exists to serve as a basis of rescission. It also contends that the elements of rescission were not satisfied on summary judgment because genuine issues of material facts exist as to (1) knowledge of the misstatement, (2) materiality of the misstatement, (3) reasonable reliance on the misstatement and the estoppel defense to reliance, and (4) the innocence of misstatements; thereby defeating rescission.

Rescission of an insurance contract is governed by Utah law. Under § 31A-21-105 of the Utah Code, "[N]o misrepresentation or breach of an affirmative warranty affects the insurer's obligations under the policy unless: (a) the insurer relies on it and it is either material or is made with intent to deceive; or (b) the fact misrepresented or falsely warranted contributes to the loss." Utah Code Ann. § 31A-21-105(2) (1994).

In interpreting these elements, a Utah appellate court has construed the "misrepresentation" term to contain a scienter element. *Derbidge v. Mutual Protective Ins. Co.*, 963 P.2d 788 (Utah Ct. App. 1998). Misrepresentation is "something more than an innocent misstatement." *Id.* at 795. Consequently, an

10

"innocent misstatement" does not constitute a "misrepresentation" for purposes of rescission.[3]

National Union sought rescission under the theory that it relied on ClearOne's material misrepresentation in its insurance application. *See* § 31A-21-105(2)(a). Accordingly, in order to invalidate ClearOne's insurance policy, National Union must first establish (1) a misstatement, (2) lack of innocence, (3) materiality, and (4) reliance. After reviewing the record and examining Utah law, we agree with the district court that National Union sufficiently demonstrated three elements—misstatement, materiality, and reliance. Nevertheless, we disagree that lack of innocence was established as a matter of law and we therefore remand on that issue.

### 1. Misstatement

Preliminarily, the parties had divergent views as to the nature of the misstatement at issue. While it is uncontested that ClearOne's 2002 10-K financial statement falsely represented ClearOne's true financial condition, *see* Aplts. Br. at 37 ("ClearOne and Bagley do not deny that the financial statements reviewed by National Union while underwriting D&O Policy were misstated."),

_____

[3] In requiring some level of bad faith before a misstatement may serve as a basis of rescission, the Utah court acknowledged the split in authority among the states on this issue. *See Derbidge*, 963 P.2d at 792. In many jurisdictions, an innocent misrepresentation will permit an insurance policy to be voidable. *See* 6 Couch on Ins. § 82:34.

two theories of the nature of the misstatement flow from the representations in the insurance application.

On one hand, National Union claims the false financial statements themselves constitute the misstatement since they were incorporated into the application. ClearOne argues, on the other hand, that the financial statements could not serve as the basis of rescission because (1) ClearOne never gave an "unqualified representation that its financials were accurate," *id.* at 29, and (2) incorporating the 10-K by reference into the application contravenes both Utah law and an insurance policy provision against incorporation of items not found in the policy or application. Instead, ClearOne maintains that the only possible misstatement flows from Flood's answer to two questions in the application which warranted against any knowledge or information that would give rise to a claim under the policy. *See* Questions 9(a) and (b), Aplts. App. at 3678.

The district court agreed with National Union and held that the false financials constituted a misstatement for purposes of rescission. We concur. Question 14 of the application clearly asks applicants to provide copies of the "latest 10K report filed with the Securities and Exchange Commission." In response, ClearOne directed National Union to its website to gain the requested forms. The application then states, "All written statements and materials furnished to the insurer in conjunction with this application are hereby incorporated by reference into this application and made a part hereof." Aplts.

12

App. at 3681.  The incorporated financials in turn become a basis of the contract issuing a policy between National Union and ClearOne.  *Id.* at 3680.

### a.   Incorporation by Reference

Taking ClearOne's second argument first, we perceive no legal infirmity in incorporating the financials into the insurance application.  Under Utah law, "an insurance policy may not contain any agreement or incorporate any provision not fully set forth in the policy or in an application or other document attached to and made a part of the policy at the time of its delivery, unless the policy, application, or agreement accurately reflects the terms of the incorporated agreement, provision, or attached document."  Utah Code Ann. § 31A-21-106(1)(a) (1996). National Union's D&O policy also states that "[t]he Application and all relevant documents will be attached to the policy at the time of delivery."  Aplts. App. at 3727.  ClearOne interprets these provisions as precluding the incorporation of the 10-K by reference.

Neither the plain language nor the purpose behind the statute support ClearOne's conclusion.  First, § 31A-21-106(1)(a) restricts only "agreement[s]" or "provision[s]" from incorporation into the insurance contract.  The 10-K Form is neither.  Instead, it is a part of the factual predicate of the application, serving to induce issuance of the policy.  The financial form was not a part of the policy's coverage terms, and was analytically no different than other information ClearOne provided to National Union.  As the Utah Supreme Court has stated, the

13

statute's "aim is to ensure that the entire insurance contract is contained in one document so that the insured can determine from the policy exactly what coverage he or she has." *Cullum v. Farmers Ins. Exch.*, 857 P.2d 922, 925 (Utah 1993). When insureds can determine their coverage under the policy "solely by relying on the [policy] document," then § 31A-21-106(1)(a) is not implicated. *Id.*; *see also Progressive Cas. Ins. Co. v. Dalgleish,* 52 P.3d 1142, 1146 (Utah 2002). Accordingly, we find that this statute does not apply to ClearOne's financial statements incorporated into the National Union application.

### b.    Warranty

ClearOne's first argument that it never gave an iron-clad warranty as to the accuracy of its financials is also unpersuasive.  ClearOne bases its argument on the fact that the financials included only a tepid certification of their accuracy.[4] Nevertheless, under § 31A-21-105, a representation need not be warranted as true to constitute a misrepresentation.  The provision distinguishes between a "misrepresentation" or a "breach of an affirmative warranty"[5] and either may

---

[4]  The corporate officials' certifications of accuracy included in the 10-K Form was expressly prefaced with the qualifying language—"[b]ased on my knowledge."  Aplts. App. at 7022.

[5]  A warranty in the law of insurance is a statement or stipulation in the policy which is breached unless absolutely true or literally fulfilled. *Zolintakis v. Equitable Life Assurance Soc.*, 97 F.2d 583, 586 (10th Cir. 1938) (applying Utah law).  An affirmative warranty affirms the existence of a fact at the time the policy is entered into. *Id.*

14

form the basis of rescission.  Utah Code Ann. § 31A-21-105(a).  The statute obviously contemplates a distinction between (1) a statement that is falsely represented and (2) a statement that violates a warranty of accuracy.  Reading a "warranty" requirement into "misrepresentation" fails to give full effect to both provisions of the statute, and we decline such an interpretation.

Utah case law pre-dating § 31A-21-105 confirms this view.  In *Fidelity & Casualty Co. v. Middlemiss*, 135 P.2d 275, 279 (Utah 1943), the Utah Supreme Court held,

> If a representation is material to the risk and likewise knowingly false, it will be as potent for a rescission of the contract embodied in the policy as if the untrue statement was made in form [of] a warranty.

Thus, ClearOne's representations in its financials were as good as a warranty.  "An inaccurate statement is an inaccurate statement, regardless of whether the maker of that statement made an additional promise to be truthful." *National Union Fire Ins. Co. v. Sahlen*, 807 F. Supp. 743, 747 (S.D. Fla. 1992).

Accordingly, the district court did not err in concluding that National Union met the misstatement element necessary to establish rescission.

## 2. Innocence

ClearOne next contends a genuine dispute of fact exists as to whether its certifying official knew the financial statements were inaccurate, or, put differently, whether it innocently presented the financials as accurate to National Union.  ClearOne argues a factual dispute exists as to CEO Frances Flood's

15

knowledge of the misstatements incorporated into the insurance contract thereby negating the scienter requirement. Nevertheless, whether Flood had *actual* knowledge of the misstatements in the financials is only part of the equation since we conclude Utah's rescission statute only requires that Flood *knew or should have known* about the misstatements.

### a. Utah Law

Recent analysis of insurance rescission law by a Utah appellate court supports the "knew or should have known" standard for innocence. In *Derbidge v. Mutual Protective Ins. Co.*, 963 P.2d 788 (Utah Ct. App. 1998), an applicant sought medical insurance from an insurer. As part of the insurer's application, the applicant answered "no" to whether she received medical treatment or advice for an organic mental disease or disorder. *Id.* at 789. The insurer issued the applicant a long-term care policy pursuant to the application. Six months later, the applicant filed a proof of loss, claiming she suffered from Alzheimer's disease. Unknown to the applicant, several years beforehand, her doctor suspected she suffered from an organic brain syndrome. The doctor noted his suspicion in her medical records but did not discuss the possible diagnosis with the applicant. Upon discovery of her medical records, the insurer rescinded her insurance policy based on the misrepresentation in her application.

Reviewing Utah law, law from other jurisdictions, and policy considerations, the court concluded that the rescission statute required an

insurance applicant have "knowledge or awareness" of the misstatement in order for it to constitute a "misrepresentation" and serve as a basis of rescission. 963 P.2d at 797. In other words, rescission may not be grounded solely on an "innocent misstatement" made by the insured. *Id.* at 793. The applicant must, therefore, "[do] something more than make an innocent misstatement." *Id.*

The court, nevertheless, left open the question of what degree of knowledge is necessary before a misstatement can be considered a misrepresentation. While not directly answered in *Derbidge*, we are not wholly left without guidance. First, the Utah court states, "at least *some level* of knowledge or awareness of a misstatement [is required] to make it a misrepresentation." *Id.* (emphasis added). Second, the court determined that the insured must have "no idea" that the misstatements were inaccurate. Third, the *Derbidge* court quotes approvingly the Utah common law standard which permits rescission of an insurance contract when "the insured *knew or should have known* [the statements and answers] to be untrue at the time he made them." *Id.* at 794 (quoting *Chadwick v. Beneficial Life Ins. Co.,* 181 P. 448, 451 (Utah 1919)); *see also Middlemiss*, 135 P.2d at 280. While the common law was abrogated by statute, as the court noted, the common law can instruct the interpretation of the rescission statute. *Derbidge,* 963 P.2d at 794. ("We see no necessary conflict between the common law rule and section 31A-21-105(2).").

17

Reading these statements together, in our view Utah courts would apply a standard of recklessness to the insured's state of mind under the statute. A misstatement is not innocent under *Derbidge* if the applicant *knew or should have known* about its falsity.

In addition to support in Utah's common law, Utah courts adopted a similar scienter requirement in interpreting the fraud element in Utah's predecessor insurance code. *See Hardy v. Prudential Ins. Co.*, 763 P.2d 761, 769 (Utah 1988) (holding that an insured's "knowledge or good reason to know" of misstatements "constitute[d] a fraud practiced upon the insurer" under now-superceded Utah Code Ann. § 31-19-8 (1974) (citing *Chadwick*)).

Next, a "knew or should have known" standard is consistent with Utah courts' interpretation of other knowledge elements. *See, e.g.*, *Strand v. Prince-Covey & Co.*, 534 P.2d 892, 894 (Utah 1975) (using the standard to establish a bona fide purchaser under the Uniform Commercial Code); *Smith v. Frandsen*, 94 P.3d 919 (Utah 2004) (applying standard to general negligent misrepresentation and fraudulent concealment claims); *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741 (Utah 2005) (employing test for knowledge element of the discovery rule); *Adamson v. Brockbank*, 185 P.2d 264, 270 (Utah 1947) (raising the standard as a factor in the creation of easements).

Other jurisdictions that define misrepresentations as non-innocent misstatements are faithful to this analysis. *See, e.g., Massachusetts Mutual Life*

18

*Ins. Co. v. Allen*, 416 P.2d 935, 941 (Okla. 1965) ("Failure to disclose a latent disease of which applicant had no knowledge, or reason to know, will not void a life insurance policy."); *Lazar v. Metropolitan Life Ins. Co.*, 290 F. Supp. 179, 181 (D. Conn. 1968) (A knowing misrepresentation occurs when an applicant "gives an answer other than that which he has reason to believe is true."); *CenTrust Mortg. Corp. v. PMI Mortg. Ins. Co.,* 800 P.2d 37, 42 (Ariz. Ct. App. 1990) ("Legal fraud occurs when an insured incorrectly states a fact about which he has actual knowledge or that is presumed to be within his knowledge. Intent to deceive need not be shown."); *First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 239 (NJ 2003) (applying "knew or should have known" standard).

We find additional support in basic insurance law, which also yields a "knew or should have known" standard. *See, e.g.*, 12A-266 Appleman on Ins. § 7300 ("[A] policy will not be avoided by [false] representations unless the insured knew that they were false or was chargeable with such knowledge."); 43 Am. Jur. 2d Ins. § 1018 ("Legal fraud in connection with insurance occurs when the insured incorrectly states a fact about which the insured has actual knowledge or that is presumed to be within the insured's knowledge.").

Under the weight of these authorities, we conclude that Utah courts would hold that an applicant's actual knowledge is not the sole basis for establishing a misrepresentation under § 31A-21-105(2). A misrepresentation occurs if the

19

applicant knows or should have known about a misstatement in the application and still presents it to the insurer.

### b. Application

In applying this standard to the facts of this case, the district court did not have the benefit of our interpretation of *Derbidge*, and concluded that ClearOne's knowledge, as a corporate entity, and not Flood's specific knowledge governed this factor. Accordingly, the district court made no definitive conclusions as to whether Flood knew or should have known about the financial misstatements attached to the National Union application.

First, the district court wrongly held that ClearOne's knowledge, as a corporate entity, as opposed to Flood's, is the dispositive question when adjudging the innocence of misstatements included in the insurance application. Without finding that Flood (or any other corporate director) possessed knowledge of the misstatements, the district court concluded, "ClearOne, as an entity, was certainly aware of the conditions which gave rise to the misstated financial statements and had a reason to know that its financial statements were incorrect." Order & Mem. Decision at 26, Aplts. App. at 7021. The court then concluded that the misstatements were not innocently presented to National Union. Yet, this approach blurs the distinction between knowledge of a corporation and knowledge of an individual director. Under the court's standard, virtually any misstatement of financial information included within an application could give rise to a

20

rescission of a corporate insurance policy. Such a reading would effectively nullify the "innocence" defense established by *Derbidge* since applicants' ignorance of the misstatement offers no protection.

Utah insurance law does not compel the *per se* imputation of any misstatement made in an insurance application to the corporation without first determining whether the application signor (or another corporate director) had knowledge of the misstatement. In Utah, it is the general rule of corporate law that only knowledge possessed by its officers and agents can be imputed to a corporation. *Lowe v. April Indus.*, 531 P.2d 1297, 1299 (Utah 1974) ("[K]nowledge of the [corporate] entity is imputed to it from the knowledge possessed by its officers and agents."). Accordingly, National Union must establish that Flood knew or should have known about the financial misstatements attached to the application. We leave open the question of whether another corporate officer's or director's knowledge, aside from Flood's knowledge, may suffice to negate the innocence of any misstatement in ClearOne's application for insurance.[6]

Second, although unclear from the court's order, to the extent the district court held that Flood had actual knowledge of the financial misstatements as a

---

[6] As a general matter, a corporate policyholder should not be able to defeat a bid for rescission based on misrepresentation by having a director ignorant of the company's improper accounting sign the insurance application while other directors fully aware of the misrepresentations sit idly by.

21

matter of law, we disagree. The crux of the district court's argument seems to be

statements made by Tim Morrison, ClearOne's former Vice President of Product

Sales, inculpating Flood in the "pay as you go" scheme. Additionally, Mike Oltz,

a managing member of one of ClearOne's distributors, claimed that Flood told

him, "for purposes of the accountants and legal requirements, ClearOne would

require payment for shipments . . . in 90 days." Order & Mem. Decision at 9,

Aplts. App. at 7004. Then, according to Oltz, Flood stated, "In writing there is a

brick wall at 90 days, in practice there is not." *Id.*

Yet, this contradicts Flood's own statements that she learned about the "pay

as you go" arrangement in December 2002, after signing the National Union

application. When a distributor earlier confronted her about the "pay as you go"

arrangement, she said it "wasn't a point of concern [for her] because [she] didn't

think it was accurate." *Id.* at 3361. She claims she assumed it was just a "tactic"

of the distributor. *Id.* Even if the evidence does show that Flood knew about the

"pay as you go" scheme, it does not mean she knew that the 10-K contained

misstatements. As she admitted, she "was not an accountant" and she would have

needed to consult with Ernst & Young, ClearOne's accountant, to determine if the

"pay as you go" scheme was a cause of concern. *Id.* In fact, ClearOne is

currently suing Ernst & Young for negligence in providing accounting advice. *Id.*

at 4457. Furthermore, Flood testified at the time she signed the Sarbanes-Oxley

certification for the 2002 financials and 10-K in September 2002, she believed

22

that there were no inaccuracies in the financials and that they fairly presented all material aspects of ClearOne's financial condition. *Id.* at 3360–61. With all inferences drawn in ClearOne's favor, we agree that Flood's actual knowledge of the misstatements in the 10-K is in doubt.

On the other hand, whether she *should have known* about the misstatements is a different question, and perhaps an easier matter to establish. In the corporate context, corporate directors have a general obligation to know the financial condition of their corporations.

> As a general rule an officer or director of a corporation is chargeable with knowledge of all matters relating to the affairs of the corporation which he actually knows or which it is his duty to know. Thus, in actions by strangers against an officer or director, the defendant will generally be charged with knowledge of all facts relating to the condition and business of the company which he might have known by the exercise of due diligence, whether actually known to him or not.

*Gay v. Young Men's Consol. Coop. Mercantile Inst.*, 107 P. 237, 240 (Utah 1910); *see also* 2 Fletcher Cyc. Corp. § 465 ("[T]he [corporate] officer is chargeable with the knowledge he or she should have had in the discharge of his or her duties."). Furthermore, under the Sarbanes-Oxley Act, the signing officer of a corporate 10-K (in this case, Flood) is required to certify the accuracy of the corporation's financial statements and requires the officer to "design[] . . . internal controls to ensure that material information relating to the [corporation] is made known to such officer[] by others within [the corporation]." 15 U.S.C. § 7241(a)(1)–(4).

23

Under the record before us, we do not know if Flood "should have known" about the financial misstatements in the 10-K. We do not know if Flood utilized reasonable internal controls that would have ferreted out the financial misstatements in the 10-K or whether she reasonably relied on Ernst & Young in conducting their business operations to satisfy the due diligence requirement of corporate directors (especially in light of ClearOne's suit against the accounting firm). Accordingly, summary judgment on this question is inappropriate since the district court did not yet have the opportunity to consider these questions. We remand this matter to the district court to consider whether Flood should have known about the financial misstatements.

### 3. Materiality

A fact is material to the risk assumed by an insurance company if reasonable insurers would regard the fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application. *Burnham v. Bankers Life & Casualty Co.*, 470 P.2d 261, 263 (Utah 1970). In other words, a material fact is one that "would naturally influence the insurer's judgment in making the contract, in estimating the degree and character of the risk, or in fixing the rate of insurance." *Middlemiss*, 135 P.2d at 279.

We do not see how ClearOne's financial records, which give an account of the financial health of the company, could not influence National Union's assessment of the company's risk. In any event, ClearOne conceded the issue at

24

oral argument.  Accordingly, we find no factual dispute as to the materiality of the financial statements.

### 4.  Reliance and the Defense of Equitable Estoppel

Finally, ClearOne contends a genuine dispute exists as to whether National Union actually relied on the financial statements in issuing the policy.  It argues, moreover, that National Union should be equitably estopped from rescinding the insurance policy based on its knowledge of the irregularities in the financial statements.

The Utah Supreme Court has laid out the standard for analyzing reliance:

> An insurance company cannot escape liability on a policy if it is established that there should have been no actual reliance on the applicant's misrepresentation, concealment, or omission.

*Hardy v. Prudential Ins. Co.*, 763 P.2d 761, 770 (Utah 1988).  The court set forth two corollaries to this rule which, if shown, prevent the insurer from escaping liability: "(1) if the insurer has information which would have put a prudent person on notice of possible falsity and would have caused an inquiry which, if carried out with reasonable diligence, would have revealed the truth, the insurer cannot rely on the misrepresentation; and (2) if the insurer chooses to make an independent inquiry and a reasonable search would have uncovered the misrepresentation but the facts were not discovered because the investigation was cursory, the insurer cannot rely on the misrepresentation."  *Id.*

25

ClearOne claims that National Union underwriters are trained to spot the "red flags" in its financial statements and "knew or should have known" of ClearOne's misstatements and likely priced the risks of the irregularities into the premium charged ClearOne for coverage. ClearOne avers this knowledge of the misrepresentation precludes reliance upon the financials and should estop rescission of the policy.

Nevertheless, we agree that National Union conducted a reasonable inquiry into the red flags in ClearOne's financial statements. After the insurance application was submitted, Brady Head, National Union's lead underwriter, sent follow-up questions regarding National Union's concerns to ClearOne via email. Head received a call from Susan Strohm, ClearOne's CFO, indicating that there had been no non-compliance issues with ClearOne's revenue recognition practices and that its financial statements had been certified as accurate under Sarbanes-Oxley. ClearOne does not challenge this assertion.

Instead, ClearOne claims that Strohm's call actually heightened Head's concerns. This is unfounded in the record even in the light most favorable to ClearOne. To the contrary, while they discussed some problems with accounts receivable and inventory levels, Head testified that Strohm answered his questions "in a satisfactory manner." Aplts. App. at 3426. Moreover, there is no indication National Union was aware of the type of questionable accounting practices later

26

revealed by ClearOne. No disputed facts suggest National Union failed to investigate adequately the financial information it was provided.

Consequently, we perceive no error in the district court's findings on reliance and equitable estoppel.

* * *

Accordingly, we find no genuine issue of material fact as to (1) the existence of a misstatement, (2) materiality, and (3) reliance. We remand, however, on the limited question of whether ClearOne's financials were innocently presented to National Union under Utah law.

## B. The Severability Clause

Next, we turn to the claims related to the severability clause. ClearOne argues the policy's severability clause prevents National Union from rescinding its policy *ab initio* and so partial coverage under the policy would survive any rescission. National Union argues the severability clause is irrelevant to the rescission analysis. Since we remand on the question of whether the misstatements supplied to National Union were innocent, and whether any knowledge might be attributed to the officers and directors, we cannot decide the precise question raised by the parties on appeal. But several points regarding the severability clause are clear at this stage in the litigation.

First of all, whether a severability clause precludes rescission is a fact intensive, case-by-case inquiry dependent on the precise language of the

27

severability clause and the facts of the misrepresentation. While severability clauses may in general limit the ability to rescind an insurance policy, in this case, the language of the severability clause does not preclude rescission of the insurance policy in its entirety.

The severability clause in National Union's application provides,

It is further agreed that in regard to the applicability of questions 8, 9, and 10 above, the facts pertaining to any knowledge possessed by any Insured (other than the knowledge and/or information possessed by the person(s) executing the application) shall not be imputed to any other Insured Person; only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer [CEO], chief operating officer [COO], chief financial officer [CFO] and General Counsel . . . of the Organization shall be imputed to the Organization.

Aplts. App. at 3680. By its language, the clause unequivocally applies only to three specific questions in the application—Questions 8, 9, and 10. As we found above, the misstatement at issue was the inclusion of a falsely stated 10-K Form submitted pursuant to Question 14 of the application. *See id.* Accordingly, the severability clause does not cover ClearOne's misstatement and it would be ineffective against National Union's rescission of the insurance policy in its entirety should the financials be deemed to be a non-innocent misrepresentation.

ClearOne invoked *In re HealthSouth Corp. Ins. Litig.,* 308 F. Supp. 2d 1253 (N.D. Ala. 2004), in support of its position. In *HealthSouth*, the court held that insurers were precluded from rescinding a policy *ab initio* where the policy contained a severability clause which limited rescission to individual insureds

28

with personal knowledge of the misrepresentation. The court recognized that a policy's severability provision takes precedence over the applicable rescission law in the situation where the policy grants greater protection for the insured than the applicable law. *Id.* at 1270.

Nevertheless, a striking difference between *HealthSouth* and the present case is the broad scope of the *HealthSouth* severability clause. In that case, the severability language of the policy stated,

> With respect to the declarations and statements contained in [this] written application(s) for coverage, *no statement in the application* or knowledge possessed by any Insured Person shall be imputed to any other Insured Person for the purpose of determining if coverage is available.

*Id.* at 1261 (emphasis added).

While the *HealthSouth* clause applied to the entire application, the clause in this case is far more limited, applying only to Questions 8, 9, and 10 of the application. ClearOne admits as much: "The severability clause contained in the National Union policy is a limited severability clause, as opposed to the full severability clause at issue in *HealthSouth*." Aplts. Br. at 26. Thus, the severability clause does not appear to cover the false financials included with the application pursuant to Question 14.

Since we find ClearOne's argument on this record unpersuasive, we need not address National Union's rebuttal argument employing *Cutter & Buck v. Genesis Ins. Co.*, 306 F. Supp. 2d 988 (W.D. Wash. 2004), except to say that the

29

severability clause in that case was even more broad than the one here and the district court still found full rescission by the insurer was not prohibited. *Id.* at 1011.

## C.  Survival of Other Claims

Finally, we consider Bagley's breach of contract and tort claims and ClearOne's affirmative charges against National Union.  ClearOne and Bagley maintain that (1) the district court erred in dismissing Bagley's claims based on its interpretation of "loss" under the policy, and (2) the district court should not have dismissed ClearOne's bad faith and punitive damages claims.

At the outset, we note, should the district court conclude that rescission *ab initio* of the policy was proper on remand, then neither Bagley's nor ClearOne's affirmative claims would survive since the effect of rescission would be to nullify the policy.  The policy would be ineffective and National Union would have no tort or contractual duty to ClearOne or Bagley to serve as a basis for these claims.[7]

---

[7] In the realm of contract law, rescission negates the existence of the contract.  *Ocean Accident & Guaranty Corp. v. Meek,* 215 P. 810, 810–11 (Utah 1923), provides,

> Generally speaking, the effect of rescission is to extinguish the contract. The contract is annihilated so effectually that in contemplation of law it has never had any existence, even for the purpose of being broken. Accordingly, it has been said that a lawful rescission of an agreement puts an end to it for all purposes, not only to preclude the recovery of

(continued...)

While we also agree with the district court's disposition of the loss question, the parties' bad faith and punitive damages claims will turn on the question of rescission.

### 1. Bagley's Claims

ClearOne and Bagley maintain the district court erred in dismissing Bagley's various counts related to his claimed "loss" under the policy. Bagley seeks coverage based upon the dilution in value of his ClearOne stock attributable to the issuance of 1.2 million additional shares of stock in settlement of the class action. Although a ClearOne shareholder, the settlement precluded him, as a settling defendant, from receiving any of the shares distributed to shareholders. National Union denied him coverage based on the rescission of the insurance policy. Bagley argues that National Union could only properly rescind his individual coverage under the policy if it could prove that either Bagley or Flood

[7](...continued)
the contract price, but also to prevent the recovery of damages for breach of the contract. [T]he rescission of a contract while in the course of performance destroys or annuls any claim which either of the parties might otherwise have in respect of performance.

Where a contract has been rescinded . . ., the parties are as a general rule restored to their original rights with relation to the subject-matter, and no action for breach can be maintained thereafter, nor are the parties bound by the contract with reference to their subsequent actions.

31

knew of ClearOne's misstatements in its 2002 financials. Furthermore, Bagley argues that the district court incorrectly concluded (1) that "[t]his injury is the same injury suffered by all other shareholders;" and (2) Bagley's injury is not one suffered by him in his capacity as a director, but only in his capacity as a shareholder." Order & Mem. Decision at 29, Aplts. App. at 7024.

We agree with the district court that Bagley's loss is attributed to his status as a major shareholder, not as a director of ClearOne. According to the policy, "loss" does not cover "any amounts for which an Insured is not financially liable or which are without legal recourse to an Insured." Aplts. App. at 3693. The dilution of his ownership share in ClearOne by the settlement does not relate to or implicate his financial or legal liability as a director of ClearOne. For example, if Bagley was simply a director with no shares in ClearOne, he would have suffered no loss from the settlement under the dilution theory. His claimed "loss" is a distinct and direct injury resulting only from his status as a ClearOne shareholder, not as a ClearOne director. Accordingly, Bagley's "loss" was not covered by the policy. In consequence, we hold that National Union did not breach the express terms of its policy nor did it violate the implied duty of good faith and fair dealing.

### 2. ClearOne's Claims

ClearOne also argues that the district court committed reversible error in failing to address its bad faith and punitive damages claims. According to

32

ClearOne, National Union violated the implied duty of good faith and fair dealing, which inheres in every contract as a matter of law, requiring National Union to "diligently investigate the facts [of ClearOne's] claim[,] . . . fairly evaluate the claim, and . . . thereafter act promptly and reasonably in rejecting or settling the claim." Aplts. Br. at 51 (citing *Black v. Allstate Ins. Co.*, 100 P.3d 1163, 1168 (Utah 2004)). We agree with ClearOne that the district court failed to address these claims. The district court's failure was justifiable considering its holding that the insurance policy was rescinded. Nevertheless, since we remand on that issue, the district court will also have to reconsider these claims on remand.

## IV. Conclusion

For the foregoing reasons, we REMAND the following questions to the district court: (1) whether submission of false financial statements in ClearOne's application met the scienter requirement under Utah law; and (2) whether ClearOne's bad faith and punitive damages claims against National Union survive summary judgment. We AFFIRM the district court's order with respect to all other issues.